## In re FRANKLIN EQUIPMENT COMPANY, Debtor.

**Roger Drake, Randy Drake, Wilson Drake, Plaintiffs,**

v.

**Franklin Equipment Company, Carolyn L. Camardo, Chapter 7 Trustee, Defendants.**

No. 08–74473–SCS.

United States Bankruptcy Court, E.D. Virginia, Norfolk Division.

Sept. 14, 2009.

Daniel F. Blanks, Douglas M. Foley, McGuireWoods LLP, Norfolk, VA, for Debtor.

Laura C. Pyle, Willcox & Savage, P.C., Norfolk, VA, for Plaintiffs.

Carolyn L. Camardo, Chapter 7 Trustee, Virginia Beach, VA, pro se.

Harry W. Jernigan, III, Jennifer T. Atkinson, Shreen N. Mahmoud, Harry Jernigan CPA Attorney, P.C., Virginia Beach, VA, for Defendants.

## MEMORANDUM OPINION

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter comes before the Court upon the Verified Motion for Relief from the Automatic Stay filed on May 13, 2009, by Roger Drake, Randy Drake, and Wilson Drake against the Debtor and the Chapter 7 Trustee, Carolyn L. Camardo. At the conclusion of the final hearing on this matter on July 21, 2009,[1] the Court took this matter under advisement. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409(a). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

## I. PROCEDURAL HISTORY

On December 31, 2008 (the "Petition Date"), Franklin Equipment Company (the "Debtor") filed a petition for relief under Chapter 7 of Title 11 of the United States Code. The Verified Motion for Relief from the Automatic Stay was filed on May 13, 2009 ("Motion for Relief"), by Roger Drake, Randy Drake, and Wilson Drake (collectively referred to herein as the "Plaintiffs") against the Debtor and the Chapter 7 Trustee, Carolyn L. Camardo (the "Trustee"). The Motion for Relief seeks an order modifying the automatic stay imposed by 11 U.S.C. § 362(a) and abandonment of certain property at issue.

The motion seeks relief as to a parcel of real property commonly known as 33551 Carver Road in Franklin, Virginia (the "Franklin Plant") and machinery, equipment, and other tangible personal property located at the Franklin Plant (the "Debtor's Personal Property"). The Motion for Relief alleges that the Franklin Plant and the Debtor's Personal Property are completely encumbered pursuant to a first priority deed of trust on the Franklin Plant held by Roger Drake and a second priority deed of trust on the Franklin Plant and a first priority security interest in the Debtor's Personal Property held by the Plaintiffs. *See* Motion for Relief, ¶¶ 27, 35.

In 2001, Roger Drake extended a $1,000,000 line of credit to the Debtor (the "Line of Credit"). *See id.* ¶ 8. The Line of Credit was originally memorialized by a Line of Credit Note dated August 15, 2001, which was secured by a first priority deed of trust on the Franklin Plant. *See id.* ¶¶ 8, 9. The Line of Credit Note was later renewed and restated by an Amended and Restated Line of Credit Note dated December 31, 2002. *See id.* ¶ 10; Proof of Claim # 139. The Amended and Restated Line of Credit Note specifically states that it is secured by the same collateral that secured the Line of Credit Note. *See* Proof of Claim # 139. The Debtor made regular payments on the Line of Credit through May 2005. *See* Motion for Relief, ¶ 11. At the time of the Debtor's bankruptcy filing, the Debtor was in default under the Line of Credit and, as evidenced by the proof of claim filed by Roger Drake, the outstanding principal balance, exclusive of interest, was $1 million. *See id.* ¶ 25; Proof of Claim # 139. The Motion for Relief estimates a pre-petition interest balance of $256,161.10, with post-petition interest continuing to accrue on the obligation. *See* Motion for Relief, ¶¶ 12, 26.

Also in 2001, the Debtor obtained a $5 million line of credit from SunTrust Bank (the "SunTrust Line of Credit"). *See id.* ¶ 14. The SunTrust Line of Credit was memorialized by a Commercial Note dated August 15, 2001 (the "SunTrust Note"),

---

1. The final hearing on this matter commenced on July 14, 2009. Due to the voluminous evidence presented, the hearing did not conclude on July 14, 2009. The hearing resumed on July 20, 2009, and concluded on July 21, 2009.

and was secured by a second priority deed of trust on the Franklin Plant and by a security agreement covering all personal property of the Debtor. *See id.* The Debtor drew on the SunTrust Line of Credit periodically until May 2003, at which time the Plaintiffs purchased the SunTrust Note from SunTrust Bank. *See id.* ¶¶ 15, 16. The purchase transpired pursuant to a Sale and Assignment Agreement dated May 1, 2003, which assigned the SunTrust Note, the security agreement, and the financing statements to the Plaintiffs. *See id.* ¶ 17. "Contemporaneously with the purchase ..., the Debtor executed a Line of Credit Note, in the original principal amount of $3,200,000," in favor of Randy Drake, as agent for the Plaintiffs (the "Replacement Note"). *Id.* ¶ 18. The Replacement Note "provides and reaffirms that it is secured by the same collateral that secured the SunTrust Note." *Id.* ¶ 19. The Debtor made regular payments on the Replacement Note through June 2006. *See id.* ¶ 22. At the time of Debtor's bankruptcy filing, the Debtor was in default under the Replacement Note and, as evidenced by the proof of claim filed by Randy Drake, as agent for the Plaintiffs, the outstanding principal balance, exclusive of interest, was $3,072,972.00. *See id.* ¶ 25; Proof of Claim # 136. The Motion for Relief estimates a pre-petition interest balance of $558,885.35, with post-petition interest continuing to accrue on the obligation. *See* Motion for Relief, ¶¶ 23, 26.

The Motion for Relief provides two arguments for why the Plaintiffs should be granted relief from the automatic stay. First, the Plaintiffs argue that pursuant to § 362(d)(1), cause exists to terminate stay because the Plaintiffs' interests in the Franklin Plant and the Debtor's Personal Property are not being adequately protected by the Trustee. *See id.* ¶ 34. According to the Motion for Relief, the Trustee has failed to make monthly payments to Roger Drake or the Plaintiffs and has "failed and refused" to pay the insurance on the Franklin Plant, provide security services to protect the property, or provide utility services related to the Franklin Plant. *Id.* ¶¶ 29–32. Further, the Trustee "has not undertaken any serious effort to sell" the property. *Id.* ¶ 33.

Alternatively, the Plaintiffs argue that pursuant to 11 U.S.C § 362(d)(2), relief should be granted because there is no equity in the property and the property is not necessary for effective reorganization. *Id.* ¶ 35. According to the Motion for Relief, the Debtor estimated the fair market value of the Franklin Plant to be $3,287,800.00. *See id.* ¶ 6; Amended Schedule A. The Debtor estimated the fair market value of the Debtor's Personal Property to be approximately $1,600,000.00. *See* Motion for Relief, ¶ 6; Amended Schedule B, items 27, 28. Thus, while the collateral is worth an estimated $4,887,800, no equity exists because—between the Line of Credit Note and Replacement Note—the property is encumbered by $4,888,018.45 in pre-petition secured claims. Further, the property at issue is not necessary for effective reorganization because, just prior to the petition date, the Debtor ceased operations and there are no plans to operate the business. *See* Motion for Relief, ¶¶ 36, 37.

The Motion for Relief further argues that abandonment of the property to the Plaintiffs is appropriate pursuant to 11 U.S.C. § 554(b) because the property is of inconsequential value and is of no benefit to the estate. *See id.* ¶ 39. The Plaintiffs again point to the fact that the property is entirely encumbered, making it of inconsequential value to the estate. *See id.* ¶ 40. Further, "[c]ontinued possession of the [Franklin Plant and Debtor's Personal Property] by the Trustee provides no ben-

efit to the estate, and the Trustee has had ample opportunity to seek a sale of the [property] and ... has neglected the opportunity." *Id.* ¶ 41.

On May 28, 2009, the Trustee filed a Response to Verified Motion for Relief from Automatic Stay (the "Trustee's Response"). The Trustee disputes the secured status of the Plaintiff's liens, claiming the funds advanced under the Line of Credit Note and Replacement Note were capital contributions to the Debtor. Trustee's Response, ¶ 29. The Trustee further asserts that this argument is presented as a counterclaim in an adversary proceeding, "in which the Trustee is requesting the Court to enter an order recharacterizing the allegedly secured claims and interests of Roger Drake, Randy Drake, Wilson Drake, and Drake Properties, LLC to equity." *Id.* ¶¶ 34, 44. The Trustee argues that there would clearly be equity in the Franklin Plant and the Debtor's Personal Property if the Plaintiff's claims were recharacterized as equity interests. *Id.* ¶ 35. On this basis, the Trustee asks the Court to deny relief or to delay a final determination in the instant matter until a determination has been made regarding the secured status of the Plaintiff's claims. *Id.* at p. 7.

On June 11, 2009, the Court held a preliminary hearing on the Motion for Relief and set a final hearing on the matter for June 29, 2009. The final hearing was later continued to July 14, 2009, upon the Court's finding, as required by 11 U.S.C. § 362(e)(1), that compelling circumstances existed to extend the date of the final hearing beyond thirty days after the conclusion of the preliminary hearing.[2]

The Trustee filed an Amended Response to the Motion for Relief from the Automatic Stay on July 11, 2009 (the "Trustee's Amended Response") and Trustee's Memorandum in Support of the Amended Response and Objection to Relief from Stay on July 13, 2009 (the "Trustee's Memorandum"). In addition to the recharacterization argument, the Trustee's Memorandum sets forth several arguments as to why the Plaintiffs cannot prove that the Debtor lacks equity in the property, a burden that the Plaintiffs must carry. *See* Trustee's Memorandum, p. 2. First, the Trustee argues that the Plaintiffs cannot establish a lack of equity by their own numbers. *See id.* Based on the Amended Schedules filed on May 5, 2009, the Trustee calculates the combined fair market value of the Franklin Plant and the Debtor's Personal Property to be at least $4,962,750. *Id.* The combined pre-petition secured claim plead by the Plaintiffs totals $4,888,018.45. *Id.* Thus, the Trustee's calculation leaves $74,731.55 in equity.

Second, the Trustee argues that the collateral is undervalued. "Based on information received during recent discovery ... a reasonable value attributable to [the Franklin Plant and the Debtor's Personal Property] would approximate $13,009,483.00." *See id.* at p. 3. Upon review of the Trustee's Exhibit B, it appears

---

**2.** Several events transpired between the date of the preliminary hearing and the date established for the final hearing to necessitate the final hearing's continuation. On June 17, 2009, the Trustee filed a Motion to Stay All Proceedings and issued subpoenas to SunTrust Bank and Goodman & Company. On June 19, 2009, the Plaintiffs filed an objection to the Motion to Stay all Proceedings. On June 19, SunTrust Bank filed a Motion to Quash and Objection to the Subpoena, and on June 22, Goodman & Company did the same. On June 23, 2009, the Court held a hearing on the Motion to Stay All Proceedings and the Motions to Quash. The Court denied the Motions to Quash, ordered SunTrust Bank and Goodman & Company to produce the subpoenaed documents within ten days of June 23, 2009, and granted the Motion to Stay All Proceedings for a limited period of time, until July 14, 2009, and extended the automatic stay to July 14, 2009, at 5:00 p.m.

the Trustee bases such calculation on the insured values of the collateral. *See* Trustee's Exhibit B, Comparison of Virginia Collateral Values. The Trustee further argues that the collateral should be valued even higher because the Plaintiffs claim a security interest in not only the Franklin Plant and Debtor's Personal Property, but also in "[a]ll of Debtor's rights, title, and interest, now existing and hereafter acquired, in all accounts, inventory, furniture, fixtures, and equipment, general intangibles, insurance proceeds, instruments, documents, and chattel paper and all proceeds and products thereof." Trustee's Memorandum, p. 3. Thus, if all of the collateral claimed to secure the debt is included, a "reasonable valuation ... is approximately $14,890,335.10, exclusive of Accounts Receivable reflected on the Debtor's Amended Schedule B (filed May 5, 2009) which total $294,685.86." *Id.*

Third, the Trustee argues that the Plaintiffs cannot establish the amount of their claim. *See id.* at p. 3–4. With respect to the Replacement Note, and based on documents received from the Debtor's accountant, Goodman & Company, the outstanding principal balance, exclusive of interest, as of June 26, 2006, was no greater than $2,316,542.48, according to the Trustee. *See id.* at p. 4. Further, according to Randy Drake's deposition testimony, no further advances were made after June 26, 2006. *See id.* With respect to the Line of Credit Note, pursuant to the resolution of

the Board of Directors, the Trustee argues that the Debtor only authorized Roger Drake to advance $550,000.00, and there is no evidence that the Board approved anything above that amount. *See id.*

Fourth, the Trustee argues that she has "uncovered additional facts and documents that support causes of action, to supplement and as an alternative to the recharacterization theory." *Id.* at p. 5.[3] These additional causes of action "could extinguish [the Plaintiffs'] secured claims either in whole or in part, thereby having the potential to create substantial equity for the benefit of the estate." *Id.* These causes of action, the Trustee argues, should be decided on the merits and in the context of the pending adversary proceedings. *Id.* at p. 5–6.[4]

In addition, the Trustee admits that she has not made monthly payments on either the Line of Credit Note or the Replacement Note, as she believes those notes do not constitute allowable secured claims against the Debtor. The Trustee also admits that she has neither paid for insurance on the Franklin Plant nor provided utility or security services for the facility. *See* Trustee's Amended Response, at ¶¶ 29–32.

Finally, the Trustee argues that the request for abandonment should be denied. Trustee's Memorandum, p. 8. The Trustee asserts she has fiduciary responsibilities to the estate to independently determine

---

**3.** The Trustee states that these additional causes of action "may include preference actions, fraudulent conveyance actions, violations under state law trust fund theory and equitable subordination." Trustee's Memorandum, at p. 5.

**4.** The Court notes for the record that two adversary proceedings have been filed in association with this case. In the first, Roger Drake v. Franklin Equipment Company and Carolyn L. Camardo, Chapter 7 Trustee (09–07027–SCS), Roger Drake seeks to determine

the extent, validity, and priority of his lien on a MetLife Insurance Policy. The Trustee filed an answer and counterclaim to the complaint, in which the Trustee argues that all the claims and interests of Roger Drake should be recharacterized to equity. In the second, *Carolyn L. Camardo, Chapter 7 Trustee, v. Randy Drake, Wilson Drake, and Drake Properties, LLC (09–07065–SCS)*, the Trustee seeks to recharacterize the asserted claims of Randy Drake, Wilson Drake, and Drake Properties, LLC, from debt to equity.

whether the collateral is of inconsequential value to the estate. *Id.* If, in the exercise of her fiduciary duties, the Trustee has not determined whether abandonment is appropriate and has therefore not agreed to abandon, it is inappropriate to force the Trustee to abandon the property. *Id.* Further, even if relief from the stay is granted, the Trustee argues that the Court should deny the request for abandonment because, in this case, a determination that relief from the stay is appropriate is not the same as determining the collateral is "of inconsequential value" to the estate. *Id.*

Based on the Trustee's assertion that the Plaintiff's secured claims constitute equity and not debt, the Trustee filed objections to several proof of claims filed by Roger Drake and the Plaintiffs, including proofs of claim 136 and 139.[5] The Trustee later filed amended objections[6] and, in addition to the recharacterization argument, alleged "that having failed to do so previously despite repeated requests by the Trustee, Roger W. Drake should be required to provide an accounting of what loans he made, when he made them and what repayments, if any, were made by the Debtor. Until such time as Roger W. Drake is able to provide proof of the loans he made ... none of his claims should be allowed in any amount." *See* Trustee's Amended Objection to Proofs of Claim No. 136, 138, 139, and 144, ¶¶ 13, 14. The Plaintiffs filed responses to the Trustee's objections, in which they ask the Court to hear and deny the Trustee's objections.

*See* Response to Objection and Request for Hearing Date, p. 4.

## II. FINDINGS OF FACT

Roger W. Drake, Sr., testified that he served as the former Chairman and Chief Executive Officer of the Debtor, having founded the company in 1951. Randy B. Drake, son of Roger W. Drake, Sr., testified that he served as Executive Vice President of manufacturing beginning in 1973. Roger Wilson Drake, Jr. (hereinafter R. Wilson Drake, Jr., or Wilson Drake), testified that he began working for the company in 1972 as Executive Vice President of sales and marketing. In mid–2007, he took over the financial and accounting aspects of the business when Bob Stephens, who previously handled those functions, passed away and Mr. Stephens's trainee resigned. Randy Drake testified that he holds approximately 22% of the shares of the company. Wilson Drake testified that he also holds 22% of the shares of the company while his father holds approximately 24%. The balance of the company's shares are divided among various grandchildren of Roger Drake, Sr. Both Randy and Wilson Drake testified that they also served on the Debtor's Board of Directors, and Randy Drake testified the company's Board of Directors held yearly meetings, for which meeting minutes were kept.

### A. The Line of Credit Note

On August 15, 2001,[7] the Debtor executed a line of credit note for the principal

---

**5.** The Trustee filed two objections on June 10, 2009: one objecting to proofs of claim 138, 139, and 144, and the other objecting to proofs of claim 136 and 140.

**6.** The Trustee filed two amended objections on June 23, 2009. The objection that originally objected to proofs of claim 138, 139, and 144, was amended to include proof of claim 136. The objection that originally objected to proofs of claim 136 and 140 was

amended to include proof of claim 142. For purposes of this opinion, the Court does not comment on the appropriateness of adding proofs of claim in amended objections or objecting to the same claim in two separate objections, as the Trustee does to proof of claim 136.

**7.** As discussed *infra*, the Debtor also received a line of credit from SunTrust Bank on this date.

sum of $1 million payable to Roger W. Drake, Sr. Plaintiff's Ex. 5, $1 Million Line of Credit Note. The pertinent terms of the Line of Credit Note were as follows. The note was payable on demand for the total principal amount advanced by Roger Drake, Sr., including accrued interest and any other amounts due, with a maturity date of December 31, 2004. Accrued interest was payable monthly starting September 1, 2001, at a per annum rate determined by the prime rate as published in the *Wall Street Journal.* The note was secured by a first priority Credit Line Deed of Trust on the Debtor's real property in Isle of Wight County, Virginia (the "Franklin Plant").[8] Randy Drake signed the Line of Credit Note and deed of trust on behalf of the Debtor. *Id.;* Plaintiff's Ex. 1, Certified Copy of Credit Line Deed of Trust (First Deed of Trust) dated August 15, 2001. Roger Drake testified that he executed a Commitment Letter dated August 15, 2001, memorializing his commitment to fund a credit line in the principal amount of $550,000.00, which sum was to be used by the Debtor "for general working capital purposes." The letter goes on to state that Roger Drake could, in his "sole and absolute discretion," advance additional funds to the Debtor up to a maximum amount of $1 million. Plaintiff's Ex. 7, Commitment Letter from Roger W. Drake, Sr., to the Debtor dated August 15,

2001. The letter exhibits an "Agreed and Accepted" signature by Roger Wilson Drake, Jr., on behalf of the Debtor. *Id.* Wilson Drake testified that the Line of Credit Note started as a $550,000.00 line of credit that was later increased to $1 million.

Roger Drake testified that the Debtor's Board of Directors provided authorization for the making of the Line of Credit Note. On cross-examination, Roger Drake testified that the Board of Directors did not provide authorization for the checks written to fund the line of credit.[9] Randy Drake confirmed that the Board of Directors authorized the Line of Credit Note, which the directors treated as a loan transaction, and that the funds were used for working capital. The text of the board resolution states that the Board of Directors approved a maximum principal amount of $550,000.00. *See* Plaintiff's Ex. 9, Minutes of a Special Meeting of the Board of Directors dated July 13, 2001.[10] Wilson Drake testified that at the time of the July 13, 2001, directors' meeting, the Board of Directors consisted of Roger, Wilson, and Randy Drake, Cliff Cutchins, and Ashby Rawls. According to Wilson Drake, Messrs. Cutchins and Rawls resigned from the board within a year after the July 13, 2001, meeting. Randy Drake testified that there was another board res-

---

**8.** Wilson Drake testified that Amended Schedule D, filed by the Debtor on May 5, 2009, incorrectly states that the Replacement Note, discussed *infra,* is secured by a first priority deed of trust on the Franklin Plant, when it is actually secured by a second priority deed of trust on that property. He further testified that the description on Amended Schedule D regarding the Line of Credit Note being secured by a lien on "Franklin property" refers to the Franklin Plant and that his father holds the first priority deed of trust on that property.

**9.** It is unclear why the Board of Directors would have needed to provide authorization

for Roger Drake to write his checks that funded the Line of Credit Note.

**10.** The board resolution also sets forth that the directors approved the sale of a parcel of real property owned by the Debtor (referred to as the Armory Drive property) to Drake Properties, LLC, an entity wholly owned by Wilson and Randy Drake, for $450,000.00, with a provision for the Debtor to lease back the property for $4,000.00 per month. Randy Drake testified the Debtor sold the Armory Drive property to provide operating capital for the company.

olution made authorizing the Line of Credit Note, but he did not bring that document with him to the hearing. Randy Drake testified that his father's equity interest in the company did not increase as a result of providing the Line of Credit. Wilson Drake also testified that the Line of Credit was always recorded as a loan in the Debtor's records and was never considered an equity investment.

Roger Drake, Sr., advanced a portion of the funds on the Line of Credit Note by way of checks drawn on his personal bank account in several increments, specifically, $150,000.00 on August 17, 2001; $400,000.00 on August 20, 2001; and two $100,000.00 increments, both on December 26, 2002. Notations of "Loan" appear in the memorandum sections of the checks dated August 17, 2001, and August 20, 2001.[11] Plaintiff's Ex. 6, Photocopies of four checks payable to the Debtor on account of Roger W. Drake. Randy Drake testified that his father provided an additional $250,000.00 in funding on the Line of Credit Note in 2003 from the proceeds of a personal loan obtained from SunTrust in May 2003 by himself, his father, and Wilson Drake, which amount "fully funded" the Line of Credit. *See* Plaintiff's Ex. 10, SunTrust Transaction List dated May 5, 2003, concerning a May 1, 2003, deposit.

Roger Drake testified that on December 31, 2002, the Debtor executed an Amended and Restated Line of Credit Note in substitution and replacement of the Line of Credit Note. Plaintiff's Ex. 8, Amended and Restated Line of Credit Note. The amended note is substantially similar to the original Line of Credit Note with three exceptions. First, the maturity date was amended to January 1, 2005. Second, accrued interest was not payable until February 1, 2003. Finally, Robert H. Stephens, then-Secretary of the company, signed the note on behalf of the Debtor. *Id.*[12]

Randy Drake testified that under the terms of the Line of Credit Note, interest payments were required, and those payments were made by the Debtor from the proceeds of the Debtor's operations until the summer of 2005. Wilson Drake testified more specifically that the last payment was made in May 2005 and as of the petition date, December 31, 2008, the principal balance remained $1 million, and interest in the amount of $256,161.10 had accrued.[13] Plaintiff's Ex. 24, Interest Accrual Schedule for Line of Credit Note with attached related documents.[14] According to Wilson Drake, interest accrued monthly on the Line of Credit Note.

Carolyn L. Camardo, the Chapter 7 Trustee, testified that it was her opinion that the Line of Credit Note was intended to be an equity investment at the time the advances under it were made.

11. The memorandum section of the two checks dated December 26, 2002, both contain the notation "1–211–111." Plaintiff's Ex. 6. It is unclear what, if any, is the meaning or significance of these notations.

12. As the terms of the original Line of Credit Note and the Amended and Restated Line of Credit Note are substantially similar, the note will be referred to as the Line of Credit Note in the remainder of this Opinion.

13. Thus, the balance on the Line of Credit Note as of the petition date totaled $1,256,161.10.

14. Spreadsheets attached to Plaintiff's Exhibit 24 reflect that records regarding accrued interest were kept in two spreadsheets, one for the amount of $750,000.00 and another for the amount of $250,000.00. Wilson Drake testified that he did not know why his predecessor in the accounting department, Mr. Stephens, set forth the Line of Credit Note in two separate increments of $750,000.00 and $250,000.00 in the Debtor's records. Wilson Drake further testified that Plaintiff's Exhibit 24 was compiled in April 2009.

## B. The Replacement Note [15]

Wilson Drake testified that the Debtor began experiencing cash flow problems in 1999 and was not profitable after that year. Randy Drake also testified that the Debtor experienced a substantial loss, between $3 and $4 million, in 1999. The Debtor had a financial relationship with SunTrust Bank in 1999, and the loss placed the Debtor out of compliance with its financial covenants with the bank, as the net value of the company dropped below $12 million as a result of the loss. Randy Drake testified that he did not recall SunTrust expressing concern in 2000 about the company's financial position. He also testified that the Debtor experienced a loss of $2 million in 2001. According to Randy Drake, between 1999 and 2001, the Debtor spoke with several financial institutions regarding obtaining loans, including G.E. Capital and BB & T, but "didn't find anything that was interesting." The Debtor also sought government-supported financing from SunTrust but was unsuccessful. In 2000 or early 2001, the Debtor hired consultants, including one from Goodman & Company and another recommended by its legal counsel, Willcox & Savage, to explore other outside financing options, but no alternative financing became available. At the same time, the Debtor had discussions with potential buyers, but ultimately no sale occurred.

Despite the losses between 1999 and 2001, SunTrust renewed the Debtor's line of credit on August 15, 2001. Randy Drake signed the SunTrust Line of Credit Note on behalf of the Debtor. Under the terms of the note, the Debtor could borrow a maximum aggregate principal amount of $5 million. The note was payable on demand for the total principal amount advanced by SunTrust, including accrued interest and any other amounts due. Accrued interest was payable monthly beginning August 31, 2001, at a variable rate determined by LIBOR [16] plus 2.5%. Plaintiff's Ex. 11, SunTrust Commercial Note dated August 15, 2001. The note was secured by a second priority Credit Line Deed of Trust on the Franklin Plant. The deed of trust states that "[t]he maximum aggregate amount of principal to be secured hereby at any one time is Two Million Dollars ($2,000,000)." Randy Drake signed the deed of trust on behalf of the Debtor. Plaintiff's Ex. 2, Certified Copy of Credit Line Deed of Trust (Second Deed of Trust) dated August 15, 2001.[17] The note was also secured by guaranties made by Roger Drake in the amount of $2 million and by Roger and Wilson Drake in the amount of $500,000.00 each. Randy Drake testified the guaranties were required due to the company's recent losses and difficulty meeting financial covenants. According to Wilson Drake, SunTrust had not previously required personal guaranties on the Debtor's line of credit.[18] The note was further se-

---

15. As explained more fully *infra,* this line of credit originated as a line of credit from SunTrust Bank and was later purchased by Roger, Wilson, and Randy Drake, who subsequently extended the line of credit to the Debtor in the maximum principal amount of $3.2 million.

16. The acronym LIBOR refers to the London Interbank Offered Rate, which is defined as "A daily compilation by the British Bankers Association of the rates that major international banks charge each other for large-volume, short-term loans of Eurodollars, with monthly maturity rates calculated out to one year." BLACK'S LAW DICTIONARY (8th ed.2004).

17. The second priority Credit Line Deed of Trust also secured a commercial note dated November 3, 1998, in the original amount of $1,501,465.26, and a commercial note dated October 16, 1998, in the original amount of $182,500.00. Plaintiff's Ex. 2.

18. Randy Drake testified that he did not know whether SunTrust had required the Drakes to supply personal guaranties prior to 2001.

cured by "[a]ll accounts, inventory, furniture, fixtures and equipment, general intangibles, instruments, documents and chattel paper now existing or hereafter acquired and all proceeds and products thereof" as described in a security agreement made by the Debtor dated June 29, 2000. Plaintiff's Ex. 11; *see also* Plaintiff's Ex. 12, SunTrust Security Agreement dated June 29, 2000. According to Randy Drake, the June 29, 2000, security agreement, which he signed on behalf of the Debtor, served as a blanket security agreement.[19] The SunTrust Line of Credit Note was further governed by additional terms and conditions contained in a commitment letter from the Debtor dated August 15, 2001. Plaintiff's Ex. 11.

The Debtor made payments on the SunTrust Line of Credit Note in the amount of $600,000.00 per quarter beginning in late 2001 or early 2002 and continuing until early 2003 according to Randy Drake. *See* Defendant's Ex. 48, SunTrust letter dated January 24, 2002; Defendant's Ex. 49, SunTrust letter dated April 26, 2002; Defendant's Ex. 50, SunTrust letter dated July 29, 2002; Defendant's Ex. 51, SunTrust letter dated October 31, 2002; Defendant's Ex. 54, SunTrust letter dated January 27, 2003 (all related to Debtor's required quarterly payments in the amount of $600,000.00 to SunTrust). According to Randy Drake, at times, in order to have enough funds to make these payments, the Debtor supplemented the income from its operations by selling equipment at "distress prices." The Debtor ultimately met the payment requirements, despite having cash flow problems and despite the stress these principal reduction payments placed upon the company.

In May 2003, Roger, Wilson, and Randy Drake purchased the SunTrust Line of Credit Note and associated Second Deed of Trust and related documents from SunTrust for $2.574 million. *See* Plaintiff's Ex. 13, Photocopy of check dated May 1, 2003. To pay this amount, the Messrs. Drake obtained a personal loan for $3.2 million from SunTrust, for which the Drakes provided security in the form of liquid securities, Certificates of Deposit, and investment accounts. Wilson and Randy Drake each provided $500,000.00 toward the purchase with the balance being provided by Roger Drake, Sr. Randy Drake testified that the payment amounts neither corresponded with nor altered the equity interests in the Debtor held by the Messrs. Drake. The loan proceeds were deposited into a joint account established by the Messrs. Drake specifically for the transaction.

Randy Drake did not recall who initiated the discussions regarding the Drakes purchasing the note. The purpose of purchasing the note was to extend better terms to the Debtor on the line of credit. Wilson Drake testified that he did not recall if SunTrust actually called the loan or if the Debtor only felt the bank was going to call the loan. Randy Drake testified that the parties considered this transaction to be a loan to the Debtor. In exchange for purchasing the SunTrust Line of Credit Note, the Messrs. Drake were assigned the security interest in the collateral securing the note. *See* Plaintiff's Ex. 14, Assignment between SunTrust Bank and Roger W. Drake, R. Wilson Drake, and Randy B. Drake dated May 1, 2003 (providing for the sale and transfer of related loan documents); Plaintiff's Ex. 3, Certified Copy of Assignment of Credit Line Deed of Trust

---

19. The security agreement included as additional collateral other personal property owned by the Debtor located in Louisburg, North Carolina; Washington, North Carolina; and Wallace, North Carolina. Plaintiff's Ex. 12.

(Second Deed of Trust) dated May 1, 2003 (assigning the Second Deed of Trust on the Franklin Plant); Plaintiff's Ex. 15, Appointment of Collateral Agent and Intercreditor Agreement dated May 1, 2003 (appointing Randy B. Drake as collateral agent for Roger W. Drake, Sr., and R. Wilson Drake for purposes of exercising all powers as the noteholder of the SunTrust Line of Credit Note); Plaintiff's Ex. 4, UCC Financial Statement Amendment Regarding Assignment from SunTrust to Roger W. Drake, R. Wilson Drake, and Randy B. Drake. The related deed of trust retained its position as a second priority deed of trust on the Franklin Plant.

Simultaneous with the purchase of the note from SunTrust, Roger, Wilson, and Randy Drake extended the existing line of credit to the Debtor in the maximum principal amount of $3.2 million. The Replacement Note was given in replacement of and substitution for the SunTrust Line of Credit Note pursuant to the assignment executed on May 1, 2003.[20] Plaintiff's Ex. 17, Line of Credit Note in the amount of $3.2 million dated May 1, 2003. The pertinent terms of the Replacement Note were as follows. The note was payable in monthly principal installments of $17,777.77 beginning August 1, 2003, plus interest, with all remaining unpaid principal, accrued interest, and any other amounts due January 1, 2005. Accrued interest was payable monthly beginning June 1, 2003, at a variable rate determined by LIBOR plus 2.5%. The note was secured by the same collateral as secured the SunTrust Line of Credit Note.[21] Robert H. Stephens, then-Secretary of the Debtor, signed the note on behalf of the

Debtor. *Id.* A Commitment Letter, also dated May 1, 2003, from Roger, Wilson, and Randy Drake reiterated the pertinent terms of the line of credit and stated that the funds were to be used by the Debtor "for general working capital purposes." Plaintiff's Ex. 16, Commitment Letter from Roger, Wilson, and Randy Drake to Debtor dated May 1, 2003. The letter exhibits an "Agreed and Accepted" signature by Robert H. Stephens, Secretary, on behalf of the Debtor. *Id.* Wilson Drake did not independently recall that a revised commitment letter was tendered to the Debtor; however, upon being presented with a copy of the letter, Mr. Drake recalled the letter and testified that the letter extended the commitment period for the Replacement Note to January 8, 2009. Plaintiff's Ex. 29, Amendment to Commitment Letter of May 1, 2003, dated December 31, 2005.

The then-outstanding balance of $2.574 million for the SunTrust Line of Credit Note was considered the first advance under the Replacement Note. The Messrs. Drake made three advances of $100,000.00 each on the Replacement Note on May 8, 2003; May 5, 2004; and June 3, 2004, by checks drawn on the above-referenced joint account held by the Messrs. Drake. The memorandum section of each of the three checks contains the word "loan." Plaintiff's Ex. 18, Photocopies of three checks payable to the Debtor dated May 8, 2003; May 5, 2004; and June 3, 2004. Both Wilson and Randy Drake testified that they did not know if board resolutions were approved for the three $100,000.00 advances.

---

**20.** Wilson Drake could not recall the purpose of the Replacement Note.

**21.** The only exception to the security provision is stated in the Commitment Letter from Roger, Wilson, and Randy Drake to the Debtor dated May 1, 2003, which states that

"upon the Company's execution of this letter agreement, the Limited Guaranties included among the Loan Documents shall be terminated." Plaintiff's Ex. 16, Commitment Letter from Roger, Wilson, and Randy Drake to Debtor dated May 1, 2003.

According to the testimony of both Wilson and Randy Drake, approximately $756,000.00 was additionally advanced under the Replacement Note in July 2006. This advance consisted of applying previously unsecured loans made to the Debtor against the credit line, thereby securing those sums. *See* Defendant's Ex. 35, Note from Randy Drake to Willcox & Savage dated June 29, 2006. Wilson Drake testified that these loans represented "where we had contributed money" previously. Randy Drake testified that the applicable interest rate for these three loans was "prime plus"[22] and that all three notes were payable on demand. The largest of the previously unsecured loans was in the principal amount of $500,000.00 made by Roger W. Drake, Sr., on June 23, 2000, and subsequently renewed on two occasions, January 1, 2002, and November 17, 2003. The memorandum section of the check written to the Debtor for this transaction, drawn on the personal bank account of Roger W. Drake, Sr., contains the notation "loan." Plaintiff's Ex. 19, Promissory Note to Roger W. Drake dated November 17, 2003, and attached related documents. Randy Drake and Wilson Drake each made an unsecured loan to the Debtor in the principal amount of $250,000.00 on June 23, 2000, and each of these loans was subsequently renewed on two occasions, January 1, 2002, and November 17, 2003. Plaintiff's Ex. 20, Promissory Note to Randy B. Drake dated November 17, 2003, and attached related documents; Plaintiff's Ex. 21, Promissory Note to R. Wilson Drake, Jr., dated November 17, 2003, and attached related documents. The memorandum sections of the two checks written to the Debtor by Randy Drake for his $250,000.00 unsecured loan contain the notation "Loan to FECO." Plaintiff's Ex. 20. The memorandum section of the check written by Wilson Drake to the Debtor for his $250,000.00 unsecured loan to the company contains the notation "Loan." Plaintiff's Ex. 21. Randy Drake testified that only $128,000.00 of his $250,000.00 unsecured loan and $128,000.00 of Wilson Drake's $250,000.00 unsecured loan was applied to the Replacement Note. These amounts, according to Randy Drake, were used to "fully fund" the credit line. According to both Wilson and Randy Drake, there had been no prior payments made by the Debtor on these three unsecured loans to reduce their balances, and no demand had ever been made for payment. *See* Defendant's Ex. 32, 2006 Notes Payable Schedule regarding unsecured loan made by Roger Drake; Defendant's Ex. 33, 2006 Notes Payable Schedule regarding unsecured loan made by Wilson Drake; Defendant's Ex. 34, 2006 Notes Payable Schedule regarding unsecured loan made by Randy Drake. Neither Wilson nor Randy Drake could recall any resolution being approved by the Board of Directors for the application of the unsecured debts made by Roger, Wilson, and Randy Drake to the Replacement Note. The Board of Directors consisted of Roger, Wilson, and Randy Drake at the time of the application of the $756,000.00 unsecured debt to the Replacement Note.

The Debtor was required and did make payments on the Replacement Note through June 2006. Specifically, Wilson Drake testified that the last payment was made June 26, 2006. Randy Drake testified that the Replacement Note was paid

---

**22.** According to the notes, the applicable interest rate for these three loans was the prime rate plus four (4) percent. Plaintiff's Ex. 19, Promissory Note to Roger W. Drake dated November 17, 2003, and attached related documents; Plaintiff's Ex. 20, Promissory Note to Randy B. Drake dated November 17, 2003, and attached related documents; Plaintiff's Ex. 21, Promissory Note to R. Wilson Drake, Jr., dated November 17, 2003, and attached related documents.

down to as low as $2.3 million at one point. Payments on the Replacement Note were not contingent upon the profitability of the Debtor. Randy Drake testified that while he, his father, and his brother expected the line of credit to be repaid, there was no specific time in which they expected repayment. The Messrs. Drake did not pursue collection efforts against the Debtor after June 2006 due to the economic conditions facing the company. They desired to allow the company's financial condition to improve through increased production and better pricing strategies. Wilson Drake testified that the principal balance on the Replacement Note as of December 31, 2008, was $3,072,972.48, and the accrued interest totaled $558,884.87 as of the same date.[23] *See* Plaintiff's Ex. 25, Interest Accrual Schedule for Replacement Note with attached related documents.

The Chapter 7 Trustee testified that, while the Replacement Note originated as a loan made by SunTrust, in her opinion it was "transformed" into an equity investment when the associated note was "paid off" by and assigned to the Messrs. Drake. However, when the Trustee was deposed on July 10, 2009, she stated that she did not believe there was a particular point in time when debt "springs" into equity. The Trustee testified she believes that, despite the "good intentions" of the Drakes, the interests of "fairness" should command that both the Replacement Note and the Line of Credit Note should be recharacterized as equity investments. In her opinion, other creditors should be paid prior to the Plaintiffs receiving payment on the two lines of credit.

C. Valuation of the Franklin Plant

The Debtor initially valued the Franklin Plant property at $1.5 million and later amended the value to $3,287,800.00. *See* Schedule A filed January 14, 2009; Amended Schedule A, filed May 5, 2009. Wilson Drake testified that the amended figure was taken from the 2008 tax assessed value because the tax assessment was the only document the Debtor possessed that contained a "value from a valid source." In Wilson Drake's opinion, the amended amount was overstated by approximately fifty (50) percent. Defendant's Ex. 10, Real Property Tax Assessments. Wilson Drake testified that the Trustee would not accept the original valuation of $1.5 million. He testified that the main building on the property was built in the late 1960s and sat on approximately thirty-five to thirty-eight acres, with three to four acres of the parcel being swampland.

Upon questioning by counsel for the Trustee, Wilson Drake confirmed that Defendant's Exhibit 8, an insurance binder dated January 6, 2009, represented insurance purchased for the Franklin Plant property and building contents as well as other property owned by the Debtor. He further testified on examination by his counsel that the values contained in the binder reflected the last known replacement values utilized by the insurance company to issue previous policies to the Debtor.

Randy Drake testified that the plant, including the building and approximately thirty acres of adjacent real property, was worth between $1.2 and $1.3 million. He described his estimate as "conservative" and based upon his opinion that the main building of the plant, a 180,000–square foot metal building that is over forty years old, is in "poor shape" and in need of maintenance. When asked by counsel for the Trustee to estimate the replacement cost

---

**23.** Thus, the balance on the Replacement Note as of the petition date totaled $3,631,857.35.

of the building, Randy Drake stated that he "would be speculating" at an amount, but that he would expect the replacement cost to exceed $5 million. The plant is adjacent to a railroad and two roadways. Randy Drake has not spoken with a realtor regarding the value of the plant.

In the Trustee's opinion, the Franklin Plant property is worth at least the $3.2 million amount reflected in the 2008 tax assessment and could sell for a higher price, perhaps $5 million to $14 million, if properly marketed.[24] As the Franklin Plant is located on a large parcel of land with railroad access, the Trustee believes the property would yield the highest sales price if marketed nationally to industrial companies. The Trustee has spoken to the Real Estate Exchange with regard to marketing the property, and she has also proposed undertaking a joint marketing effort with the Drake family.[25] However, the Trustee stated she only "recently" obtained a key to the Debtor's Franklin Plant.

### D. Valuation of Personal Property Located at the Franklin Plant

The Plaintiffs seek relief as to machinery, equipment, and other personal property of the Debtor located at the Franklin Plant. Randy Drake was qualified as an expert to testify as to the value of certain personal property.[26] Wilson Drake was also qualified expert to testify as to the value of inventory and equipment of the

Debtor based upon his experience in the sales and service aspects of the company.

According to Wilson Drake, the total tax assessed value of all of the Debtor's personal property, including that located at the Debtor's North Carolina and Oregon facilities, was $5,641,885.00 as of the date of filing. *See* Defendant's Ex. 11, Personal Property Tax Assessments. The Debtor valued the machinery, fixtures, equipment, and supplies at the Franklin Plant at $567,100.00. *See* Amended Schedule B, filed May 5, 2009; *see also* Plaintiff's Ex. 22, Franklin Equipment Company Inventory Listing of Equipment and Tools, revised April 7, 2009.[27] Randy Drake testified that he arrived at this value based upon his review of an inventory list of the equipment as well as the age and condition of the items at the time of filing. However, he testified that, as of the date of the hearing on the instant motion, the value would be lower because the plant has been idle for seven months and the current economic conditions contributed to a "bad market" for used equipment. Wilson Drake testified that the Debtor originally valued the machinery, fixtures, equipment, and supplies at the Franklin Plant at $38,368.00, which amount was based on the depreciated net book value of those items. *See* Schedule B, filed January 14, 2009.

Together with his brother Wilson Drake, Randy Drake assigned a liquidation value

---

**24.** The Trustee produced no documentation to support her opinion as to the sales price the Franklin Plant could yield.

**25.** According to the Trustee's Amended Response, her proposal to the Plaintiffs to jointly market the properties was rejected by the Plaintiffs. Trustee's Amended Response, at ¶ 33.

**26.** Counsel for the Trustee objected to Randy Drake being qualified as an expert on the basis that Mr. Drake is a party to the instant motion. The Court overruled this objection,

finding that Randy Drake had sufficient knowledge to testify as to the value of the collateral since, by his testimony, he had served as the Executive Vice President of manufacturing for the Debtor since 1973, was involved in the production and purchasing operations of the Debtor, and kept abreast of the industry through attendance at trade shows.

**27.** According to Plaintiff's Ex. 22, the total book value, based upon the purchase prices of the machinery, was $5,770,761.00.

of approximately $918,600.00 to the Debtor's inventory at the time of filing. *See* Amended Schedule B, filed May 5, 2009.[28] This amount was calculated by discounting the cost of the inventory (which was recorded in the company's records), with the discount factor being based upon Randy Drake's lack of confidence in the accuracy of the Debtor's inventory list[29] and his knowledge that certain parts were now obsolete, thus providing no market for resale. Like the machinery and equipment values, Randy Drake believed the value of the inventory would be lower now because of a downturn in the market and less demand by the Debtor's customers for the inventory. Wilson Drake testified that he would defer to his brother regarding the liquidation value of the inventory but in his opinion, the values on the schedules were "high" and the value of the inventory was decreasing daily.

The Debtor valued its office equipment and furnishings at $15,000.00. *See* Amended Schedule B, filed May 5, 2009. Wilson Drake testified that this valuation was an estimate and was not based on net book value of the office equipment and furnishings.

The Debtor valued its accounts receivable at a total value of approximately $160,000.00 on its original Schedule B, but according to Wilson Drake, the Debtor adjusted the amounts to remove credit balances on certain accounts pursuant to instructions received from the Chapter 7 Trustee at the Section 341 creditors' meeting. As a result, the accounts receivable increased to approximately $294,000.00 on Amended Schedule B. Wilson Drake testified that the accounts receivable were originally turned over to the Trustee, but she returned them to the Drakes for collection. Approximately one-half of the accounts receivable had been collected as of the date of the hearing, with the money collected being applied to the Debtor's expenses, such as insurance, security, and utilities.[30] Wilson Drake testified that the expenses exceeded the accounts receivable collected to date.

The Debtor also scheduled among its assets certain patents and intellectual property, including engineering drawing packages. The drawing packages were valued at $50,000.00, but the patents were valued at zero, as Wilson Drake testified they were not utilized.

### E. Testimony Regarding Insurance, Security, and Utility Services

The Chapter 7 Trustee testified that despite requests by the Messrs. Drake, she has declined to provide utility and security services as well as insurance on any of the Debtor's property. The Trustee testified that there was no money in the Debtor's estate to pay for such services. The Trustee did not recall telling the Messrs. Drake that it was beyond the powers of a trustee to provide casualty insurance on a debtor's property. The

**28.** The total value assigned to all of the Debtor's inventory, including that located at the Debtor's locations in North Carolina and Oregon, was $1,111,850.00. Amended Schedule B, filed May 5, 2009. The total book value (taken from the company's records) for the inventory was $2,933,610.00. Plaintiff's Ex. 26, Estimated Inventory Liquidation Value summary and attached related documents.

**29.** Randy Drake testified it had been "several years" since a full inventory had been performed at the Franklin Plant. Wilson Drake

also testified that he was "skeptical" as to the accuracy of the inventory because a physical inventory had not been taken in two to three years. However, as to the company's financial records, Wilson Drake testified that the company's books were in "good order" when he took over the accounting functions in mid–2007.

**30.** *See* discussion regarding expenses incurred by the Messrs. Drake on behalf of the Debtor *infra*.

Trustee stated that she typically directs secured creditors to protect their interests in property serving as their collateral and similarly advised the Messrs. Drake to do so. The Trustee recalled that the Messrs. Drake indicated at a meeting held January 5, 2009, that they would pay for insurance on the Franklin Plant and that Roger Drake, Sr., inquired several times as to when he would be reimbursed for sums expended for supplying insurance and security services for the premises.

According to an e-mail message dated January 12, 2009, counsel for the Plaintiffs offered to provide post-petition loans and/or use of cash collateral to assist the Trustee in paying for insurance, utility, and security services. Plaintiff's Ex. 27, E-mail string dated January 9, 2009, through January 14, 2009. However, the Trustee testified that she did not recall the Plaintiffs providing any financing proposals. According to an e-mail dated January 13, 2009, from the Trustee's counsel to counsel for the Plaintiffs (on which the Trustee was copied), the Trustee had advised the Messrs. Drake at a meeting held January 5, 2009, that she had no authority to incur debt for such services on behalf of the estate. *Id.* The same e-mail reflects that the Trustee understood the importance of having utility services at the Debtor's facilities, evidenced by her counsel's inquiries and discussions at the January 5, 2009, meeting with the Messrs. Drake of potential damage at the facilities if utility services were disrupted. *Id.* A subsequent e-mail from the Trustee's counsel to counsel for the Plaintiffs reiterated that the Trustee would not pay the premiums for property and casualty insurance. Plaintiff's Ex. 28, E-mail string dated January 14, 2009. The Trustee testified that she did not recognize or recall any of these e-mails.

Wilson Drake testified that, as of the hearing date, he estimated his family had expended in excess of $50,000.00 to provide hazard insurance, security service, and utility service at the Franklin Plant property. Specifically, the insurance company, CNA, had a minimum charge of $56,000.00 for providing the policy on the Franklin Plant premises.

No further evidence was presented by the Plaintiffs or by the Trustee.

## III. THE DEFENSE OF RECHARACTERIZATION

### A. Objections to Claims Consideration

As earlier noted, the Trustee has objected to the proofs of claim filed by the Drakes for the claims represented by the Line of Credit Note and the Replacement Note, asserting that grounds exist for this Court to recharacterize these obligations as capital contributions and thereby disallow them as claims of indebtedness against the Debtor. Given that the instant proceeding before this Court is a motion for relief from the automatic stay, should the Court consider the Trustee's claim objections? If the Court determines that the claims objections should be considered in this relief from stay proceeding, to what extent should the claims objections be considered given that a relief from stay hearing is a summary proceeding? Resolution of this threshold consideration is necessary to guide the Court in the proper adjudication of the defense of recharacterization asserted by the Trustee.

It is well-settled that a hearing for relief from the stay is a summary proceeding. *Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 31 (1st Cir.1994); *Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 219 (4th Cir.1994); *In re Vitreous Steel Prods. Co.,* 911 F.2d 1223, 1232 (7th Cir.1990); *Johnson v. Righetti (In re Johnson),* 756 F.2d 738, 740 (9th Cir.1985). Many courts have held that the

only issue a court should adjudicate in the context of a relief from stay proceeding is whether the creditor has a colorable claim on its lien. *Grella,* 42 F.3d at 33 ("[A] court hearing a motion for relief from stay should seek only to determine whether the party seeking relief has a colorable claim...."); *In re Vitreous Steel Prods.,* 911 F.2d at 1232 (questions involving validity of liens are not generally at issue in relief from stay proceeding but rather, only whether there is a colorable claim by creditor); *In re Johnson,* 756 F.2d at 740 (the validity of a claim or contract underlying the claim should not be litigated during a relief from stay proceeding since such proceedings are summary in nature and thus, the bankruptcy court should not have considered state law in awarding attorney fees to prevailing debtor); *see EEE Commercial Corp. v. Holmes (In re ASI Reactivation, Inc.),* 934 F.2d 1315, 1321–22 (4th Cir.1991) (bankruptcy court did not err in refusing to adjudicate fraud claims in connection with relief from stay hearing); *County Fuel Co. v. Equitable Bank Corp.,* 832 F.2d 290, 293 (4th Cir.1987) (finding that matters potentially relating in issue to a motion to lift the stay relate to the adequacy of the creditor's protection, the debtor's equity, and the necessity of the property for an effective reorganization and determining that merits of counterclaims are not in issue). However, these cases, except *In re ASI Reactivation,* involve the issue of whether the relief from stay determination had a preclusive effect on subsequent proceedings. None of these cases prohibits the Court from adjudicating the merits of a direct defense challenging the validity of the creditor's lien and consequently the debtor's equity in the subject property.

The Court is persuaded by the analysis and reasoning set forth in *United Companies Financial Corp. v. Brantley,* 6 B.R. 178 (Bankr.N.D.Fla.1980), which held that a bankruptcy court should consider a claim objection in a relief from stay context where the objection is premised on grounds that go to the heart of the creditor's claim. The debtors in *Brantley* sought to refinance and to extend several loans that were in default. *Id.* at 182. After the lender refused, the debtors filed bankruptcy. In responding to the lender's motion for relief from stay, the debtors denied the lender's allegations as to the lack of equity and set forth several reasons why modifying the stay would be unfair. *Id.* at 181. The debtors filed an objection to the lender's claim stating essentially the same matters asserted in the answer as well as the additional claims of usury and churning. *Id.* at 182. At the final hearing on the motion for relief from the stay, the debtors attempted to consolidate and present evidence on the churning and usury objections. The court sustained the lender's objection but allowed the debtors to present limited evidence on the usury and churning claims. *Id.* The court took the matter under submission but continued the stay for sixty days, during which time it issued its opinion. *Id.* at 183. In the opinion, the court set forth its reasoning in determining what issues should be considered in a relief from stay context:

> The key determination as to whether or not any matter, claim or circumstance should bear upon the amount of the creditor's claim (and hence trigger resulting effects upon the debtors' equity, probable harm to and adequate protection for a creditor, as well as, probable successful plan formulation) is whether such matter, claim or circumstance directly or only indirectly relates to the amount of such creditor's claim. If it directly relates it should enter into the determination of the court in the exercise of its discretion whether or not the injunction should be maintained or vacated or modified. If it is only indirectly related, it should not enter into the con-

sideration of whether to vacate or maintain the injunction.

Although defenses or counterclaims may be related or, to an extent, be plausibly relevant to any determination of the amount of debt due if they are based upon allegations such as misapplication or wrongful receipt of funds, breach of contract or various miscellaneous alleged contractual duties, or fraud or false representations, they are related or relevant only in the sense that, if successfully maintained, they would ultimately effectuate a reduction or set-off in the overall debt-credit relationship between the parties. These type of matters and claims really do not go to the validity and amount of the specific debt or lien itself.

Contrasted to such defenses or counterclaims, however, are those based upon such matters as alleged violations of the statute of frauds which would bar any recovery whatsoever on the specific debt itself; non-perfection of a security interest which would bar any lien enforcement whatsoever on the debt itself; or usury which would bar any recovery either to some extent or totally on the debt itself depending upon the circumstances. Other such counterclaims or defenses might be based upon a lack of consideration altogether, as distinguished from a failure of consideration, or some circumstances of unconscionability which would bar recovery upon the specific debt itself. These latter defenses or counterclaims strike at the very heart of the specific debt amount itself which the creditor seeks to enforce by way of his lien or the validity of the lien itself. The former type of defenses or counterclaims do not so strike. They relate generally to the overall debt-credit relationship between the parties.

. . . .

In sum, then, when affirmative defenses or counterclaims are asserted and raised which strike at the heart of the amount of the creditor's claim or the validity of his lien, such defenses or counterclaims directly affect the issue of equity and thus the issues of harm and adequate protection, as well as the reasonable probability of any plan of reorganization. When such are asserted or raised, the court should give consideration to them in determining whether or not the stay should remain in effect. In the event a determination is made that the stay should continue, due consideration should be given to a consolidation of all of the issues for prompt hearing in order that an early and final determination can be made as to the merits of the defenses or counterclaims and with respect to the propriety of any vacation, modification or maintenance of the stay.

*Id.* at 185–89. Although the court did not reach the merits of the claim objection, it did consider the objection and denied relief until the objection could be adjudicated. *Id.* at 189.

 The Court concludes that *Brantley* establishes the proper framework to determine whether merely to consider or fully adjudicate the defenses raised in a relief from stay context. First, the Court must determine whether the grounds raised by a defendant against a relief from stay proceeding are collateral matters. Collateral matters are grounds involving an affirmative attack upon the underlying debt by way of offset or counterclaim that would normally be set forth separately as an affirmative defense or counterclaim in ordinary civil litigation. *Vale Mills Corp. v. Gellert (In re Gellert)*, 55 B.R. 970, 976 (Bankr.D.N.H.1985). In contrast, direct matters deal with questions of equity, adequate protection, effective reorganization, and factual or legal defenses to the amount, priority, or validity of the lien in question. *Id.* Collateral matters are con-

sidered on a summary basis. *Id. But cf. D-1 Enters., Inc. v. Commercial State Bank,* 864 F.2d 36, 38 (5th Cir.1989) (counterclaims against a creditor seeking relief from the stay on largely unrelated matters are not to be handled in the summary fashion); *Cheshire County Sav. Bank v. Pappas (In re Pappas),* 55 B.R. 658, 661 (Bankr.D.Mass.1985) (court can consider, but not adjudicate, defenses raised at hearing on relief from stay though defenses strike at the heart of the validity of creditor's claim). The merits of such matters are not adjudicated. Rather, the inquiry is limited to whether the creditor has a colorable claim on its lien.

■ If the Court finds that the defenses raised by the defendant are direct defenses—ones that go the heart of the creditor's claim—then the Court should adjudicate the merits of the non-collateral matters in deciding whether to grant the relief from the stay. *Bialac v. Harsh Inv. Corp. (In re Bialac),* 694 F.2d 625, 627 (9th Cir.1982) (finding that debtor's affirmative defenses and counterclaims directly involved the question of the debtor's equity should be heard in the stay proceeding); *Madison Nat'l Bank v. Chiapelli,* 131 B.R. 354, 357–58 (E.D.Mich.1991) (determination on the merits of a direct defense challenging the validity of a lien is not precluded); *In re Souders,* 75 B.R. 427, 432 (Bankr.E.D.Pa. 1987), *overruled on other grounds by FRG Ltd. P'ship v. Manley (In re FRG, Inc.),* 919 F.2d 850 (3d Cir.1990) (court must consider those defenses that strike at the very heart of the validity of a creditor's claim); *In re Dino & Artie's Automatic Transmission Co.,* 68 B.R. 264, 268 (Bankr.S.D.N.Y.1986) (court should entertain contest of validity of the creditor's lien because the issue goes to the heart of the creditor's interest in the property); *In re Tally Well Serv., Inc.,* 45 B.R. 149, 152–53 (Bankr.E.D.Mich.1984) (court must consider the issues raised in adversary proceeding in determining whether to lift the stay); *see also In re Poughkeepsie Hotel Assocs. Joint Venture,* 132 B.R. 287, 292 (Bankr.S.D.N.Y.1991) (court adjudicated defenses of equitable subordination because the issue went to the heart of the creditor's claim); *Resolution Trust Corp. v. Shehu (In re Shehu),* 128 B.R. 26, 30 (Bankr.D.Conn.1991) (debtors allowed to establish affirmative defenses and counterclaims for determination of equity); *In re The Moore & White Co.,* 83 B.R. 277, 283–84 (Bankr.E.D.Pa.1988) (court agreed to decide fraudulent transfer defense at relief from stay hearing although lack of evidence precluded decision); *Bargas v. Rice (In re Rice),* 82 B.R. 623, 626 (Bankr. S.D.Ga.1987) (court was compelled to deny motion and leave stay in effect until litigation on claim was pursued when presented with evidence in defense of motion for relief that strongly supports the inference that the lien might be invalid); *In re Paolino,* 72 B.R. 555, 558 (Bankr.E.D.Pa.1987) (court would have decided counterclaim if evidence of such counterclaim was offered); *In re Compass Van & Storage Corp.,* 61 B.R. 230 (Bankr.E.D.N.Y.1986) (court adjudicated state law issue regarding respective lease rights because the issue was essential to the determination of relief from the stay and such finding was a prerequisite to the automatic stay determination); *In re Dennison,* 50 B.R. 950, 955 (Bankr.E.D.Pa.1985) (court adjudicated defenses raised by defendants in a motion for relief from stay proceeding); *United Penn Bank v. Dudley (In re Dudley),* 38 B.R. 666, 669 (Bankr.M.D.Pa.1984) (court determined a fraudulent transfer counterclaim in a motion for relief from stay); *Univ. State Bank v. Davenport (In re Davenport),* 34 B.R. 463, 466 (Bankr.M.D.Fla. 1983) (court denied relief from stay request until affirmative defenses of preferential and fraudulent transfers are adjudicated since the validity of the creditor's lien was at issue). *But cf. In re Greater*

*Jacksonville Transp. Co.,* 172 B.R. 376, 380 (Bankr.M.D.Fla.1994) (procedurally improper to raise matters in an objection to claim in context of stay litigation). Under this approach, the "interests of judicial economy and the speedy and economical determination of litigation" would be served. *In re Poughkeepsie Hotel,* 132 B.R. at 291 (quoting *In re Sonnax Indus., Inc.,* 907 F.2d 1280, 1287 (2d Cir.1990)) ("The 'interests of judicial economy and the speedy and economical determination of litigation' supports the consideration of affirmative defenses in relief from stay litigation.").

■ The Court will fully adjudicate the merits of the Trustee's claims objections relating to her contention the Line of Credit Note and the Replacement Note should be recharacterized as capital contributions to the Debtor by the Messrs. Drake. The Trustee objects to the entirety of the claims represented by the Line of Credit and the Replacement Note on the ground that these obligations should be recharacterized as capital contributions under the parameters announced in the decision by the Fourth Circuit Court of Appeals in *Fairchild Dornier GmbH v. The Official Committee of Unsecured Creditors (In re Official Committee of Unsecured Creditors for Dornier Aviation (North America), Inc.),* 453 F.3d 225 (4th Cir. 2006). This ground goes to the heart of the claims the Messrs. Drakes assert in their motion for relief. Therefore, the full adjudication of the Trustee's claims objections with respect to the Line of Credit Note and the Replacement Note will focus on whether the Trustee has presented sufficient evidence to prevail under the defense of recharacterization she raised in defense of the motion for relief from the automatic stay of the Drakes.

## B. The Merits of the Defense of Recharacterization

■ It remains to assess the merits of the affirmative defense raised by the Trustee that the indebtedness of the Drakes secured by the Franklin Plant and the Debtor's Personal Property should be recharacterized as equity. Recharacterization of debt as equity was considered by the Fourth Circuit Court of Appeals as a matter of first impression in *In re Official Committee of Unsecured Creditors for Dornier Aviation (North America), Inc.,* 453 F.3d 225 (4th Cir.2006) (hereinafter *"Dornier"*). Concluding that recharacterization was a remedy available to the Bankruptcy Court, the Court wrote:

> In our view, recharacterization is well within the broad powers afforded a bankruptcy court in § 105(a) and facilitates the application of the priority scheme laid out in § 726. The Code establishes a system in which contributions to capital receive a lower priority than loans because "the essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied." *See Diasonics, Inc. v. Ingalls,* 121 B.R. 626, 630 (Bankr.N.D.Fla.1990) (quoting Asa S. Herzog & Joel B. Zweibel, *The Equitable Subordination of Claims in Bankruptcy,* 15 VAND. L.REV. 83, 94 (1961)). Thus, implementation of the Code's priority scheme requires a determination of whether a particular obligation is debt or equity. Where, as here, the question is in dispute, the bankruptcy court must have the authority to make this determination in order to preserve the Code's priority scheme. If the court were required to accept the representations of the claimant, as GMBH appears to argue, then an equity investor could label its contribution a loan and guarantee itself higher priority—and a larger recovery—should the debtor file for bank-

ruptcy. Thus, denying a bankruptcy court the ability to recharacterize a claim would have the effect of subverting the Code's critical priority system by allowing equity investors to jump the line and reduce the recovery of true creditors. In light of the broad language of § 105(a) and the larger purpose of the Bankruptcy Code, we believe that a bankruptcy court's power to recharacterize is essential to the proper and consistent application of the Code. *Dornier*, 453 F.3d at 231. In endorsing the availability of recharacterization in the bankruptcy court, the Fourth Circuit Court of Appeals also strongly cautioned as to the necessity of distinguishing the more familiar remedy of equitable subordination:

> Like disallowance, equitable subordination also differs markedly and serves different purposes from recharacterization. While a bankruptcy court's recharacterization decision rests on the substance of the transaction giving rise to the claimant's demand, its equitable subordination decision rests on its assessment of the creditor's behavior. As the Tenth Circuit has explained, when a claim is equitably subordinated, "[t]he funds in question are still considered outstanding corporate debt, but the courts seek to remedy some inequity or unfairness perpetrated against the bankrupt entity's other creditors or investors by postponing the subordinated creditor's right to repayment until others' claims have been satisfied." *Sender v. Bronze Group, Ltd. (In re Hedged–Invs. Assocs., Inc.)*, 380 F.3d 1292, 1297 (10th Cir.2004); *see also id.* ("The doctrine of equitable subordination, by contrast, looks not to the substance of the transaction but to the behavior of the parties involved."). Thus, although recharacterization and equitable subordination lead to a similar result, they "address distinct concerns" and require a bankruptcy

court to conduct different inquiries. *See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 (3d Cir.2006).

*Dornier*, 453 F.3d at 232–33.

■ The Sixth Circuit Court of Appeals also notes the important distinction in remedy between equitable subordination and recharacterization:

> The effect of a bankruptcy[ ] court's recharacterization of a claim from debt to equity may be similar to the court's subordination of a claim through equitable subordination in that, in both cases, the claim is subordinated below that of other creditors. However, there are important differences between a court's analysis of recharacterization and equitable subordination issues. Not only do recharacterization and equitable subordination serve different functions, but the extent to which a claim is subordinated under each process may be different.... Recharacterization cases "turn on whether a debt actually exists, not on whether the claim should be equitably subordinated." In a recharacterization analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the effect is subordination of the claim "as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation." In an equitable subordination analysis, the court is reviewing whether a legitimate creditor engaged in inequitable conduct, in which case the remedy is subordination of the creditor's claim "to that of another creditor only to the extent necessary to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective."

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748–49 (6th Cir.2001) (internal citations

omitted) (hereinafter *"AutoStyle"*). As Judge Waites has succinctly reminded, "reclassification is substantially different from subordination in that subordination focuses on the creditor's behavior; whereas, reclassification rests on the substance of the transaction giving rise to the claim." *Vieira v. AGM II, LLC (In re Worldwide Wholesale Lumber, Inc.)*, 372 B.R. 796, 811 (Bankr.D.S.C.2007).[31] Accordingly, when recharacterization is asserted as a remedy "[r]ather than recharacterizing the exchange from debt to equity, or subordinating the claim for some reason, the question before this Court is whether the transaction created a debt or equity relationship from the outset." *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D.Va.1997) (hereinafter *"Cold Harbor"*).[32]

 *Dornier*, relying upon *AutoStyle*, provides the factors a court may consider in determining whether it should recharacterize a claim:

(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. These factors all speak to whether the transaction "appears to reflect the characteristics of . . . an arm's length negotiation." This test is a highly fact-dependent inquiry that will vary in application from case to case.

*Dornier*, 453 F.3d at 233–34 (quoting *AutoStyle*, 269 F.3d at 749–50).[33] Despite the

---

**31.** As Judge Mitchell of this Court has noted:

As a practical matter, recharacterization of a debt as equity achieves essentially the same result as equitable subordination, since equity receives distributions in bankruptcy only after creditors have been paid in full. *Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 322 (D.Del.2003). However, recharacterization proceeds from a different premise. Equitable subordination, as noted, focuses on the creditor's conduct vis-a-vis the debtor or other creditors. By contrast, "[w]hen a putative loan to a corporation is recharacterized, the courts effectively ignore the label attached to the transaction at issue and instead recognize its true substance." *In re Hedged–Invs. Assocs., Inc.*, 380 F.3d 1292, 1297 (10th Cir.2004) (emphasis added). As a result, "[t]he funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as corporate debt, but are instead treated as a capital contribution." *Id.*

*Wilson v. Moir (In re Wilson)*, 359 B.R. 123, 140 (Bankr.E.D.Va.2006).

**32.** "Some of the confusion between the doctrines is caused by the fact that undercapitalization is a factor in the equitable subordination analysis and often is a factor in a recharacterization analysis, leading 'some courts to equitably subordinate claims that other courts would recharacterize as equity contributions.' " *AutoStyle*, 269 F.3d at 749 (citing Matthew Nozemack, Note, *Making Sense Out of Bankruptcy Courts' Recharacterization of Claims: Why Not Use § 501(c) Equitable Subordination?*, 56 WASH. & LEE L.REV. 689, 717 (1999)).

**33.** The Trustee urges that the Court must apply each of the *Dornier* factors at the time of each advance made by Roger Drake under the Line of Credit Note and by the Messrs. Drake under the Replacement Note; however, she provides no case law in support of this argument. A reading of *Dornier* does not suggest such an analysis is required, given its

comprehensive list of factors to be considered by a court in adjudicating a claim of recharacterization, *Dornier* warns that "[n]one of these factors is dispositive and their significance may vary depending upon circumstances," *id.* at 234 (quoting *Sender v. Bronze Group, Ltd. (In re Hedged-Invs. Assocs., Inc.)*, 380 F.3d 1292, 1298–99 (10th Cir.2004)), and "no mechanistic scorecard suffices." *Id.* (quoting *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir.2006)). The Fourth Circuit specifically admonishes that the insider status of a creditor and undercapitalization alone are insufficient to invoke this dramatic remedy:

> We think it important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans. However, when other factors indicate that the transaction is not a loan at all, recharacterization is appropriate to ensure the consistent application of the Bankruptcy Code.

*Id.* Judge Shelley, in a decision prior to *Dornier*, well summarized the thematic concerns of the various factors contemplated by other courts in evaluation of whether exercise of the remedy of recharacterization is appropriate:

> A reading of the two lists of factors together highlights a few main themes that demarcate the distinction between loans and equity contributions in these situations. A critical group of factors concern the formality of the alleged loan agreement. The more specific and complete the parties are in identifying and codifying the terms of the alleged loan agreement, the more like a loan the transaction appears. By contrast, if the terms of such an agreement are vague and non-specific, such a transaction appears more like a shareholder contributing capital to keep his investment afloat. A second important group of factors relate to the financial situation of the corporation at the time the purported loan is made. If investing in the corporation appears to have been especially risky (e.g. it was thinly capitalized), or the source of funds to repay the loan is not made clear, then the transaction has more of the earmarks of an equity contribution. An additional group of factor in this category is the relationship between the limited partners equity ownership and the parties' participating in the making of the loan, reflected by the concern over whether there is identity between the equity holders and the alleged lenders, and whether control of the corporation is dependent upon the loan in question.

*Cold Harbor*, 204 B.R. at 916.

Applying these principles to the evidence adduced in the bankruptcy court, the Fourth Circuit Court of Appeals supported the conclusion that recharacterization was appropriate:

> The court determined that, while some aspects of the transaction were consistent with a loan, the transaction on the whole was more consistent with a capital contribution. The court found particu-

---

emphasis on the analysis of whether a loan was actually intended as a capital contribution at its inception. While the *Dornier* court found it was not error for the bankruptcy court to have considered the "use of later events to understand GMBH's broader intent," it does not appear a review of the

factors indicating a capital contribution or not is necessary at the time of every line of credit advance. As Judge Shelley has reminded us "the question before this Court is whether the transaction created a debt or equity relationship from the outset." *Cold Harbor*, 204 B.R. at 915.

larly significant (1) GMBH's insider status, (2) "the lack of a fixed maturity date" for the purported loan, (3) the fact that [Dornier] would not be required to pay until it became profitable, (4) [Dornier's] "long history of unprofitability and the fact that its liabilities after the corporate restructuring far exceeded its assets," and (5) GMBH's assumption of [Dornier's] losses. We believe that these facts adequately support the bankruptcy court's recharacterization decision here.

*Dornier,* 453 F.3d at 234. Application of these same factors here leads to a far different conclusion. We will first consider the Line of Credit Note followed by the Replacement Note.

### C. The Line of Credit Note

#### 1. The Names Given to the Instruments

▇▇ "The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *AutoStyle,* 269 F.3d at 750 (citing *Roth Steel Tube Co. v. Comm'r of Internal Revenue,* 800 F.2d 625, 631 (6th Cir.1986) (hereinafter *"Roth Steel"*)). In this case, the Line of Credit Note is plainly labeled as such. Plaintiff's Ex. 5, Line of Credit Note. Its terms and conditions are typical of those found in commercial notes. This agreement is .a valid and enforceable instrument that evidenced indebtedness.

#### 2. The Presence or Absence of a Fixed Maturity Date and Schedule of Payments

▇▇ "The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans." *AutoStyle,* 269 F.3d at 750 (citing *Roth Steel,* 800 F.2d at 631). The Line of Credit Note provides "[t]his Note shall be payable ON DEMAND" and "[i]f not sooner paid or demanded, the entire unpaid balance, together with all accrued interest, late charges, costs, and expenses due hereunder, shall be due and payable in full on December 31, 2004." Plaintiff's Ex. 5. The Line of Credit Note also provides for interest at the prime rate of interest as published in the *Wall Street Journal. Id.* While some reviewing courts have expressed the notion that an absence of required principal curtailments in an instrument may weigh towards an indicia of equity, this Court concurs with the assessment of the Sixth Circuit Court of Appeals in *AutoStyle:*

> The bankruptcy court noted that the absence of a set schedule of repayment of principal weighs in favor of equity, but is not dispositive. The district court, however, noted that the participation agreements used demand notes as well as a fixed rate of interest and regular interest payments, which it believed was indicative of a loan. Moreover, the district court stated that rigid application of a rule that the lack of a fixed maturity date and fixed repayment schedule was indicative of equity "would create a per se rule that use of a demand note by an insider would always be indicative of an equity contribution rather than a loan." We agree and therefore conclude that the use of demand notes along with a fixed rate of interest and interest payments is more indicative of debt than equity.

*AutoStyle,* 269 F.3d at 750. Here the provisions of the Line of Credit Note weigh towards the conclusion it originated as debt.

#### 3. The Presence or Absence of a Fixed Rate of Interest and Interest Payments

▇▇ "The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans." *Id.* (cit-

ing *Roth Steel*, 800 F.2d at 631). The Line of Credit Note included a fixed interest rate and fixed interest payments. Interest was paid on the Line of Credit Note by the Debtor every month from its inception until June 2005. Plaintiff's Ex. 24. Thereafter, because of cash flow issues, no further payments were made. *Id.* The Trustee asserts the failure of the Debtor to make a payment or of Roger Drake to initiate collection efforts on the Line of Credit Note is evidence that this instrument was, in fact, intended to be equity. A similar argument was rejected in *AutoStyle:*

> The defendants were to be paid at 2% over the prime rate "as [CIT] is paid by [AutoStyle]." The defendants subsequently agreed to defer interest payments. At best, Bayer can argue that this factor cuts both ways since the deferral of interest payments indicates the possibility that during the course of the transaction the defendants eventually never expected to get repaid and converted their debt to equity. Still, it does not change the fact that, initially at least, there was a fixed rate of interest and interest payments, indicating that the transaction was originally intended to be debt not equity. Moreover, the deferral of interest payments does not by itself mean that the parties converted a debt transaction to equity since the defendants still expected to be repaid.

*AutoStyle*, 269 F.3d at 750–51 (citing *Cold Harbor*, 204 B.R. at 915 (noting that recharacterization applies to transactions that were equity contributions "ab initio")). The Line of Credit Note bears a rate of interest and interest was paid on the Line of Credit Note for nearly four years. There is no evidence in the record of this final hearing that Roger Drake has ever abandoned his intention ultimately to be repaid the amounts advanced by him under the Line of Credit Note. The danger of imputing recharacterization implications to a creditor's election to forebear from col-

lection efforts was well recognized by Judge Schmetterer:

> Debtor's argument seems to be that a creditor's agreement to forbear until Debtor is in position to pay will result in recharacterization of secured or unsecured debt to equity. It can hardly be argued that forbearance in the face of financial stress by itself supports a finding of recharacterization. Forbearance until a debtor's cash flow improves may be good judgment to keep a loan out of bankruptcy court, and that is all to be concluded from [the creditor]'s forbearance for a time in connection with [Debtor]'s debt. Moreover, forbearance came after all the loans were made under commercially common terms and documentation. If such forbearance could retroactively convert a good loan to equity, that would indeed validate the saying that "no good deed goes unpunished."

*Repository Techs., Inc. v. Nelson (In re Repository Techs., Inc.)*, 363 B.R. 868, 883 (Bankr.N.D.Ill.2007). The subsequent difficulty of the Debtor to continue interest payments and the forebearance of Roger Drake from exercising his rights to declare the Line of Credit Note in default or to exercise his collection remedies thereunder are insufficient to persuade the Court that the evidence under this factor strongly points to a conclusion that the Line of Credit Note is and was intended to be debt.

### 4. The Source of Repayments

 "If the expectation of repayment depends solely on the success of the borrowers business, the transaction has the appearance of a capital contribution." *AutoStyle*, 269 F.3d at 751 (citing *Roth Steel*, 800 F.2d at 631). The Line of Credit Note was intended to be paid from the cash flow of the Debtor. Additionally, however, Roger Drake received a first priority deed of trust upon the main manufac-

turing plant of the Debtor in Franklin, Virginia. These circumstances were considered in *AutoStyle:*

> The bankruptcy court noted that the source of repayment of the defendants' participation interests in the CIT credit facility is identical to the source looked to by CIT for repayment of its portion of the credit facility: AutoStyle's earnings, secured by a lien on all of AutoStyle's assets. We agree with the district court that these facts weigh only slightly in favor of equity. The fact that CIT and the defendants were to be paid out of AutoStyle's earnings indicates that they were dependent on the success of AutoStyle's business, however, this is balanced to some extent by the security of the lien on all of AutoStyle's assets.

*Id.* Here this factor weighs toward a conclusion the Line of Credit Note constitutes debt. Had the Line of Credit Note been payable only from profits of the Debtor, it would in that respect resemble a dividend and be an indicia of a capital contribution. The repayment of the Line of Credit Note was, and is, secured by a first deed of trust on the principal manufacturing facility of the Debtor, and, while doubtless originally intended to be an alternative source of repayment, nonetheless now is the only source of repayment of the Line of Credit Note. *See In re Blevins Concession Supply Co.*, 213 B.R. 185, 188 (Bankr.M.D.Fla. 1997) ("In the instant case, a Convertible Subordinated Promissory Note ... in the principal amount of $1,500,000.00 was executed by the President of the Debtor on April 4, 1995. The Note provided for periodic interest payments to be made by the Debtor and that the unpaid principal balance, together with all accrued, unpaid interest was due and payable in full on Sep-

tember 30, 1996. Clearly, the repayment of the advance was not tied to the 'fortunes of the business' and, therefore, the repayment terms of the Note are indicative of a loan and not a capital contribution."). All loans to a commercial borrower are initiated with the expectation they will be repaid from the earnings of the borrower, with the collateral securing the loan serving as a secondary source of repayment should earnings be insufficient to regularly pay the indebtedness. Even if the Debtor could only repay the Line of Credit Note by surrendering the collateral, such circumstance does not mean the Line of Credit Note was not a loan. *See In re Airadigm Commc's, Inc.*, 376 B.R. 903, 909 (Bankr.W.D.Wis.2007) ("The fact that [the Debtor] could only repay the loans by surrendering the collateral does not mean they were not loans."). In this regard, the Line of Credit Note resembles a typical commercial loan, and this factor weighs toward a conclusion the Line of Credit Note was initiated as debt and not as a capital contribution.

### 5. The Adequacy or Inadequacy of Capitalization

██ "Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans." *AutoStyle*, 269 F.3d at 751 (citing *Roth Steel*, 800 F.2d at 630). However, even the existence of undercapitalization alone is not sufficient to invoke recharacterization. *Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co.)*, 371 B.R. 589, 630 (Bankr.D.N.H.2007). "Undercapitalization is a poorly-defined phrase, and especially so in the context of bankruptcy." *In re Lifschultz Fast Freight*, 132 F.3d 339, 343 (7th Cir.1997).[34] *See Mach. Rental, Inc. v. Herpel (In re Multiponics, Inc.)*,

---

34. Judge Cudahy has commented on the seeming taint of the term "under-capitalization" in the context of an equitable subordination claim:

Undercapitalization sounds bad. It may not bear the harsh stigma of words like "fraud" and "deceit," but courts often seem to use "undercapitalization" as a term of

622 F.2d 709, 717 (5th Cir.1980) ("the concept of undercapitalization has never been precisely defined"). In the context of an equitable subordination claim, the Seventh Circuit Court of Appeals has provided a reasoned test of the adequacy of capitalization:

A firm is adequately capitalized for purposes of equitable subordination if its equity capital equals or exceeds "what reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise." *Mobile Steel*, 563 F.2d at 703 (citing N. Lattin, THE LAW OF CORPORATIONS §§ 15, 77 (1971)).

To put this rule of reason into practical form, the approach finding the most favor is the two-pronged test enunciated in *Mobile Steel*. This test takes its cue from observable, formal changes in the firm's capital structure. The first prong looks to the moment of initial capitalization of the firm. Undercapitalization exists at inception "if, in the opinion of a skilled financial analyst, [the capitalization] would definitely be insufficient to support a business of the size and nature of the [debtor] in light of the circumstances existing at the time the bankrupt was capitalized." *Mobile Steel*, 563 F.2d at 703. The second prong looks to the time of the insider's loan, which may or may not be after inception. Undercapitalization at the time of the loan exists if the debtor "could not have borrowed a similar amount of money from an informed outside source." *Id.* If the debtor could have raised the funds elsewhere on similar or better terms, the inference would be that a third party thought that the firm had enough equity capital and was, in light of that fact and others, creditworthy. One can therefore safely conclude that such a firm is not undercapitalized. If the firm could not have borrowed elsewhere, however, the firm was undercapitalized at the time of the insider's loan.

*In re Lifschultz Fast Freight*, 132 F.3d at 351.[35] The Fifth Circuit Court of Appeals has adopted a somewhat similar measure:

---

opprobrium. Admittedly, some cases contain language suggesting that undercapitalization is in itself inequitable conduct. For example, some courts have justified equitable subordination by noting the presence of undercapitalization and "other inequitable conduct," *In re Fabricators*, 926 F.2d 1458, 1470 (5th Cir.1991) (emphasis added); *see also, e.g., In re Herby's Foods, Inc.*, 2 F.3d 128, 132 (5th Cir.1993) ("additional inequitable conduct"); *cf. In re Lifschultz Fast Freight Corp.*, 181 B.R. 346, 353 (Bankr. N.D.Ill.1995) (denying subordination in absence of "other inequitable conduct"), *rev'd*, 191 B.R. 712 (N.D.Ill.1996). While such language may be confusing, it has been established that equitable subordination requires "suspicious, inequitable conduct beyond mere initial undercapitalization." *In re Branding Iron Steak House*, 536 F.2d 299, 302 (9th Cir.1976); *see also In re Herby's Foods*, 2 F.3d at 132 ("[U]ndercapitalization alone generally is insufficient to justify

equitable subordination .... however ... the Insiders herein did more."); *In re Fabricators*, 926 F.2d at 1469 (dictum); *In re Octagon Roofing*, 157 B.R. 852, 858 (N.D.Ill.1993); *In re Hyperion Enters.*, 158 B.R. 555, 563 (D.R.I.1993). Because mere undercapitalization does not, and should not, justify equitable subordination, we think the better view is that, while undercapitalization may indicate inequitable conduct, undercapitalization is not in itself inequitable conduct.
*In re Lifschultz Fast Freight*, 132 F.3d at 345–46.

**35.** Judge Cudahy also instructs that the proper measure of capital requires further refinement of the financial analysis:

There really are two questions: what to measure, and how to measure it. The kind of capital a court is measuring has various names—shareholder equity, paid-in capital

Absolute measures of capital inadequacy, such as the amount of stockholder equity or other figures and ratios drawn from the cold pages of the corporation's balance sheets and financial statements, are of little utility, for the significance of this data depends in large part upon the nature of the business and other circumstances. Nor is the fact of eventual failure an appropriate test. *Cf. Automotriz Del Golfo De California S.A. De C. v. Resnick,* 47 Cal.2d 792, 799, 306 P.2d 1, 6 (1957) (Carter J., dissenting) (disregard of corporate entity). This would be tantamount to ruling that an investor who takes an active role in corporate affairs must advance to his corporation all of the funds, which hindsight discloses it needed to survive. Instead, we think that for the purposes of determining whether claims against the bankrupt estate held by organizers or shareholders should be subordinated on the ground of undercapitalization, the amount of capitalization that is adequate is

what reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise.

N. Lattin, THE LAW OF CORPORATIONS §§ 15, 77 (1971); *cf.* H. Ballatine, CORPORATIONS 302–03 (rev. ed.1946) (disregard of corporate entity); *see generally* E. Latty, SUBSIDIARIES AND AFFILIATED CORPORATIONS, 119–28 & 133–38 (1936). This general definition is helpful because it focuses on the culpability of the organizer-stockholders and pegs the assessment to more specific standards which do not involve open-ended quantitative questions. Foremost among the standards which the general statement suggests are the following:

(1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and

---

or equity capital—but whatever it is called, it means the excess of total assets over total liabilities. This is the kind of capital to which *Pepper* directed our attention, 308 U.S. at 309, 60 S.Ct. at 246, and it is the kind that *Mobile Steel* had in mind. *Mobile Steel,* 563 F.2d at 703. It is also the kind of capital upon which the Code predicates its definition of insolvency. *See* 11 U.S.C. § 101(32). Shareholder equity differs from other measures of capital that accountants and lawyers might use, such as a firm's total assets or the moribund concept of legal or stated capital (as in "par value"). William P. Hackney & Tracey G. Benson, *Shareholder Liability for Inadequate Capital,* 43 U. PITT. L.REV. 837, 890 (1982). It is "the cushion of protection afforded to creditors—net assets, or the total contribution made by the shareholders." *Id.*

Shareholder equity should also be (but is not always) distinguished from working capital. Working capital is that portion of a firm's assets that are in relatively liquid form—the current assets such as cash, ac-

counts receivable and inventory. Net working capital is the excess of current assets over current liabilities; it measures the ability of a firm to pay its debts as they mature. Working capital thus means something quite different from equity capital. The distinction is neatly shown with a balance sheet and the accounting identity $A=L+NW$ (assets = liabilities plus net worth, or equity capital). Working capital refers to a kind of asset that the firm holds; it shows up as an entry on the left-hand side of the balance sheet. Equity capital, on the other hand, refers to a kind of claim against the assets of the firm, the owners' stake, and is entered on the right-hand side. The other kind of claim against the firm's assets is debt (or liability); and once all the liabilities of a firm have been set off against its assets (and assuming there are still some assets left), the residuum is equity capital. A common transaction involves a firm's using its equity capital as a basis for acquiring working capital—as in the case before us. *In re Lifschultz Fast Freight,* 132 F.3d at 350.

nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;

(2) Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source.

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 702–03 (5th Cir.1977). The Court finds that the same factors employed in a determination of whether adequate capitalization exists in an equitable subordination context are equally applicable under an analysis of capitalization in a recharacterization consideration.[36]

██ There is little evidence in this record upon which to found a conclusion that the Debtor was inadequately capitalized at the time of the making of the Line of Credit Note. The Debtor had commenced its business operations in 1951 and had operated continuously from that time. Apparently in times prior to those relevant here, the Debtor had enjoyed substantial business success. Commencing in the late 1990s, the Debtor experienced cash flow problems, which continued until its demise in late 2008. The failure of the Debtor to continue regular payments on the Line of Credit Note in June 2005 was caused by its cash flow problems. Additionally, both Wilson Drake and Randy Drake testified that the Debtor at times had experienced operating losses. That, however, is the full extent of the evidence of inadequate capitalization on the part of the Debtor. No financial records of the Debtor, other than ledgers compiling payments on the Line of Credit Note and the Replacement Note, were exhibited at the final hearing, as were no financial statements created by the Debtor's accountants for any time period. The evidence is certain that the Debtor had cash flow problems: nothing else has been adduced.

The Trustee urges that this Court should infer that the debtor had inadequate capitalization at the time of the making of the Line of Credit Note because of the Drakes' admission of cash flow problems. Such an inference, without additional evidence, is inappropriate. Cash flow difficulty alone is not sufficient evidence of inadequate capitalization. *See Malcolm v. Franklin Drywall, Inc.*, Civil No. 06–4155, 2009 WL 690082, at *2 (D.Minn. Mar. 12, 2009) ("The evidence showed that Franklin Drywall's financial woes stemmed primarily from credit and cash flow problems, rather than from undercapitalization."); *Credit Managers Ass'n of Southern Cal. v. Federal Co.*, 629 F.Supp. 175, 183–84 (C.D.Cal.1985) (finding that, even though the business was heavily in debt, the business had sufficient cash flow to service its debt load and continue operations and thus, was not undercapitalized as a result of a stock buyout).

Furthermore, the evidence is certain that at the same time of the making of the Line of Credit Note, SunTrust Bank, a non-insider, made a line of credit facility available to the Debtor in the original amount of $5 million. Accordingly, under the teachings of the Fifth and Seventh Circuit Courts of Appeal, such credit availability from a non-insider lender strongly refutes any notion of inadequate capitalization at the time of the making of the Line of Credit Note by the Debtor. *AutoStyle*, 269 F.3d at 751 ("There is disputed evidence that cuts both ways as to this factor. Bayer presents evidence that AutoStyle was in serious financial straits at the time the defendants entered into the participation agreements and that it had negative working capital for nine straight years, but there is also evidence from the defendants that AutoStyle was obtaining money from disinterested third parties, in-

---

**36.** *See* fn. 32, *supra.*

cluding Bayer itself, at the time the transfers were made."); *see Credit Managers Ass'n,* 629 F.Supp. at 184, 186 (financing company's agreement to lend further amounts supports finding that the company was not undercapitalized, even though adjusted projections showed negative cash flow). The factor of inadequate capitalization of the Debtor at the time of the making of the Line of Credit Note is unsupported in the record regarding the assertion that the Line of Credit Note was intended as a capital contribution and not as debt.

### 6. The Identity of Interest Between the Creditor and Stockholder

 "If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt." *AutoStyle,* 269 F.3d at 751 (citing *Roth Steel,* 800 F.2d at 630). " 'Where there is an exact correlation between the ownership interests of the equity holders and their proportionate share of the alleged loan … this evidence standing alone is almost … overwhelming.' " *Id.* (quoting *Cold Harbor,* 204 B.R. at 919). The testimony of each of the Drakes was the common stock ownership of the Debtor at the time of the making of the Line of Credit Note was as follows: Roger Drake, approximately 24%; Wilson Drake, approximately 22%; and Randy Drake, approximately 22%. The remainder of the stock was divided among various grandchildren of Roger Drake. Roger Drake was the sole source of the monies advanced under the Line of Credit Note. No other shareholder of the Debtor participated in the Line of Credit Note. Accordingly, analysis of this factor strongly indicates the Line of Credit Note was intended as a loan.

### 7. The Security for the Advances

 "The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans." *Id.* at 752 (citing *Roth Steel,* 800 F.2d at 631). As has been discussed, Roger Drake secured the repayment of the Line of Credit Note with a valid, first position deed of trust on the principal manufacturing facility of the Debtor. Therefore, this factor weighs in favor of a loan.

### 8. The Corporation's Ability to Obtain Outside Financing

 "When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." *Id.* As noted above, SunTrust Bank made a $5 million line of credit facility available to the Debtor simultaneously at the time of the making of the Line of Credit Note. However, the Trustee argues the fact that the Drakes guaranteed up to $2 million of advances under this credit facility taints the credit facility as a true non-insider financing. *AutoStyle* rebuts this notion:

> Bayer contends that the bankruptcy court improperly concluded that $12.5 million in 1988 loans from PNC Bank and Mellon Bank were from disinterested lenders because the loans were guaranteed by two of AutoStyle's primary suppliers: PPG Industries in the case of the PNC loan and Bayer in the case of the Mellon Bank loan. It is true that the guarantees came from important suppliers, but the fact remains that the financing came from outside lending institutions. That the guarantees were required for the financing does not change this fact. There is no requirement that outside financing come without any involvement of "interested" par-

ties. Therefore, this factor weighs in favor of a loan. *Id.* The availability of this substantial credit facility from an outside source at the same time as the making of the Line of Credit Note weighs in favor of a conclusion the Line of Credit Note was intended as debt and not as a capital contribution.

### 9. The Extent to Which Advances Were Subordinated to Claims of Outside Creditors

■■■ "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *Id.* at 752 (citing *Roth Steel,* 800 F.2d at 631–32). The advances under the Line of Credit Note were not subordinated to the claims of any of the Debtor's creditors. This fact is strongly indicative of debt.

### 10. The Extent to Which Advances Were Used to Acquire Capital Assets

■■■ "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *Id.* (citing *Roth Steel,* 800 F.2d at 632). The Drakes have presented undisputed evidence that the funds that were actually provided pursuant to the Line of Credit Note were used for working capital that enabled the Debtor to meet daily operating needs. Therefore, this factor weighs toward debt.[37]

### 11. The Presence or Absence of a Sinking Fund to Provide Repayments

■■■ "The failure to establish a sinking fund for repayment is evidence that the

advances were capital contributions rather than loans." *Id.* at 753 (citing *Roth Steel,* 800 F.2d at 632). Here the Debtor never established a sinking fund for the retirement of the Line of Credit Note. However, in the Court's experience, it is unusual in commercial transactions involving lines of credit for any non-insider lender to require establishment of a sinking fund, and particularly so where the borrower is a smaller, non-publicly traded entity such as the Debtor. Furthermore, the pledging of collateral for the repayment of the Line of Credit Note by the Debtor also mitigates the absence of a sinking fund. *Id.* ("The bankruptcy court noted the absence of a sinking fund and concluded that this factor weighed toward equity. We agree with the district court, however, that 'the loans were secured with liens, which obviated any need for a sinking fund.' Therefore, we conclude that this factor only slightly weighs toward equity, if at all."); *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago (In re S.M. Acquisition Co.),* No. 05–C–7076, 2006 WL 2290990, at* 10, n.13 (N.D.Ill. Aug. 7, 2006) (internal citations omitted) ("The [motion for a more definite statement] does not mention the existence or absence of a sinking fund, though the Bank's response brief suggests that the Bank did not require such a fund. Nonetheless, this factor does not seem particularly relevant, as secured liens apparently mitigate the need for a sinking fund."). Here the absence of a sinking fund is a neutral factor at best.

■■■ In summary then, application of the *Dornier* factors to the evidence adduced at the final hearing concerning the Line of Credit Note overwhelmingly supports the conclusion the Line of Credit

---

**37.** Counsel for the Trustee argued that the use of the Line of Credit Note proceeds for working capital and not for the acquisition of capital assets was indicative of an intent to make the Line of Credit Note as a capital contribution. This, of course, is precisely the opposite of the holding in *AutoStyle* and *Dornier.*

Note was intended to be debt and should not be recharacterized as capital contribution.

### D. The Replacement Note

██ The circumstances of the origins of the loan that was ultimately evidenced by the Replacement Note present a unique dilemma in application of the analysis commanded by *Dornier*. As detailed above, this loan to the Debtor was originated by SunTrust Bank in 2001 as a $5 million line of credit, secured by a second priority deed of trust on the manufacturing plant of the Debtor and all of the Debtor's personal property. Additionally, the Drakes guaranteed the repayment of up to $2 million of this loan. The Trustee concedes this non-insider loan was unquestionably intended to be debt when originated. The Trustee, however, argues this loan, when purchased by the Drakes in 2003, was "transformed" into equity as a result of their acquisition.

The Court is unable to locate any decision that has considered whether a loan indisputably originated as debt by a non-insider lender that is subsequently purchased and continued by insiders can ever have its certain origin as debt "transformed" into capital contribution. Remembering decisions teach that a court considering recharacterization must center its focus on the time at the time of origination of a challenged transaction, *see AutoStyle*, 269 F.3d at 747–48 (quoting *Cold Harbor*, 204 B.R. at 915) ("Recharacterization is only appropriate where the circumstances show that a debt transaction was 'actually an equity contribution [ ] *ab initio*.' "), a strong argument may be waged that a transaction originated as a loan may not change its fundamental character, unless perhaps the purchasing insiders effect such radical modification of the terms and conditions of the transaction after acquisition so as to remove its original character. The Trustee has presented nothing to suggest that existing law or the existence of a good faith argument for the reversal or a modification of existing law support of this component of her argument. Nevertheless, and assuming *arguendo* that for recharacterization purposes a loan may experience "transformation" after acquisition, the Court will analyze the loan represented by the Replacement Note at the time of its purchase by the Drakes.

#### 1. The Names Given to the Instruments

The Replacement Note is entitled "Line of Credit Note." Plaintiff's Ex. 17. This agreement is a valid and enforceable instrument that is evidence of indebtedness.

#### 2. The Presence or Absence of a Fixed Maturity Date and Schedule of Payments

The Replacement Note provides it is due and payable on January 1, 2005. The Replacement Note was payable in monthly installments of principal of $17,777.77 plus interest thereon. *Id.* The Debtor made the required payments until June 2006, paying the note down to a balance as low as $2.3 million at one point. All of this indicates the Replacement Note was intended as debt.

#### 3. The Presence or Absence of a Fixed Rate of Interest and Interest Payments

The Replacement Note included a fixed interest rate and required fixed interest payments. Payments were made as required under the note until June 2006. Plaintiff's Ex. 25. The Debtor did not make further payments thereafter due to cash flow issues. *Id.* The Trustee asserts, as she did with regard to the Line of Credit, that the Debtor's failure to make a payment or the Drakes' failure to initiate collection efforts on the Replacement Note is evidence that the instrument was intended to be equity. For the same reasons the Court rejected this argument in its analysis of the Line of Credit Note, the Court

also rejects the Trustee's argument with regard to the Replacement Note. Like the Line of Credit Note, there is no evidence in the record before the Court that the Drakes ever abandoned their intention ultimately to be repaid the amounts advanced under the Replacement Note. The fact that the Debtor experienced subsequent difficulty in continuing to make the required payments and the forebearance of the Drakes from exercising their rights to declare the Replacement Note in default or to exercise the collection remedies thereunder are insufficient to persuade the Court that the evidence under this factor strongly points to a conclusion that the Replacement Note is and was intended to be debt.

### 4. The Source of Repayments

The source of repayment of the Replacement Note was the business operations of the Debtor and secondarily the liquidation of the real and personal property securing the repayment of the Replacement Note, all of which is consistent with a loan transaction.

### 5. The Adequacy or Inadequacy of Capitalization

As explained earlier, there is no persuasive evidence of inadequate capitalization on the part of the Debtor at any time relevant hereto.

### 6. The Identity of Interest Between the Creditor and Stockholder

At the time of the making of the Replacement Note, the common stock of the debtor was held as follows: Roger Drake, approximately 24%; Wilson Drake, approximately 22%; and Randy Drake, approximately 22%; and the remainder of the stock was divided among various grandchildren of Roger Drake. The Replacement Note was purchased by the Drakes from SunTrust Bank by Roger Drake supplying consideration in the amount of $1.5 million and Wilson Drake and Randy Drake each supplying

$500,000.00 of the total approximate purchase price of $2.5 million. Accordingly, the respective percentages of ownership of the Replacement Note were: Roger Drake, 60%; Wilson Drake, 20%; and Randy Drake, 20%, which percentages are at substantial variance with their percentage of equity ownership in the Debtor. The additional advance represented by the reissuance of formerly unsecured debt of Roger Drake, Wilson Drake, and Randy Drake in the amount of $756,000.00 was divided as follows: Roger Drake, $500,000.00; Wilson Drake, $128,000.00; and Randy Drake, $128,000.00, for participation percentages of approximately 66%, 17%, and 17%, respectively, which also is in great variance to the division of equity ownership of the Debtor. The Replacement Note was not advanced in proportion to the equity interests of the Drakes in the Debtor, weighing toward the conclusion the Replacement Note was intended as a loan.

### 7. The Security for the Advances

The Replacement Note continued the liens originally granted by the Debtor in its manufacturing plant and all its personal property, indicating its nature as a loan transaction.

### 8. The Corporation's Ability to Obtain Outside Financing

There is no evidence of outside financing being available to the Debtor at the time of the making of the Replacement Note.

### 9. The Extent to Which Advances Were Subordinated to Claims of Outside Creditors

There is no evidence in the record of the final hearing of any agreement on the part of the Drakes to subordinate the loan represented by the Replacement Note to the claims of other creditors. While the Debtor ceased payments on the Replacement Note in 2006, there is no evidence the Drakes

ever abandoned their expectation to be repaid on the Replacement Note.

### 10. The Extent to Which Advances Were Used to Acquire Capital Assets

The advances under the Replacement Note were utilized as working capital by the Debtor, indicating the Replacement Note was a loan.

### 11. The Presence or Absence of a Sinking Fund to Provide Repayments

No sinking fund was established by the Debtor for repayment of the Replacement Note, which factor is tempered by the fact the Debtor continued the liens earlier granted to secure this loan in its manufacturing plant and all of its personal property.

As with the Line of Credit Note, the application of the *Dornier* factors to the evidence adduced at the final hearing concerning the Replacement Note convincingly indicates that, even if the character of a loan originated by a non-insider can be "transformed" by its acquisition by insiders, here the Replacement Note remained as debt and never became a capital contribution. The Trustee, looking beyond the *Dornier* factors, argues that the original SunTrust Line of Credit was guaranteed by the Drakes and SunTrust Bank required the Drakes to buy the loan, therefore indicating the financial extremis the Debtor was experiencing and that in essence the SunTrust loan thereby became capital. This notion fails for a number of

reasons. First, there is no evidence in the record that the SunTrust Line of Credit was ever demanded or called by the bank. More importantly, the Trustee's argument at its essence is whenever a non-insider loan is subsequently purchased by insiders, the mere continuation of the loan by the insiders *ipso facto* converts the loan to capital, presumptively because of the original insider guaranty. The policy implications of this axiomatic conclusion would be catastrophic to the financing of small businesses such as the Debtor by its discouragement of insider guarantors to offer their personal guarantees as credit enhancement and to intervene and continue needed financing when a non-insider is unwilling to continue a loan. Frankly put, if recharacterization were ordered here under the Line of Credit Note and the Replacement Note, there would be virtually no circumstances where a loan originated or continued by an insider would not be vulnerable to recharacterization should the debtor ultimately experience financial difficulty.

The absence of a close factual question here on the defense of recharacterization of the Line of Credit Note or the Replacement Note is perhaps best explained by the Trustee's misapprehension of the nature and elements of the remedy of recharacterization as set forth in *Dornier*.[38] Suffice it to say, there is little or no relevant evidence in this record to support a recharacterization of either the Line of Credit Note or the Replacement Note, and the Trustee's defense of recharacterization to

---

**38.** The Chapter 7 Trustee testified that, while the Replacement Note had its origins as a loan when it was made by SunTrust, in her opinion it was "transformed" into an equity investment when the associated note was "paid off" by and assigned to Roger, Wilson, and Randy Drake. However, when the Trustee was deposed on July 10, 2009, she stated that she did not believe there was a particular time when debt "springs" into equity. The

Trustee stated at the final hearing she believed that, despite the "good intentions" of the Drakes, the interests of "fairness" should command that both the Replacement Note and the Line of Credit Note should be recharacterized as equity investments. In her opinion, other creditors should be paid prior to the Drakes receiving payment on the two lines of credit.

the motion for relief from automatic stay of the Drakes is denied. The Court now turns it focus to the issue of whether the Plaintiffs should be granted relief from the automatic stay under § 362 of the Bankruptcy Code.

## IV. THE AUTOMATIC STAY

The Plaintiffs seek relief from the automatic stay pursuant to subsections (d)(1) and (d)(2) of Section 362 of the Bankruptcy Code. Section 362(d) states:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization

11 U.S.C. § § 362(d)(1)-(d)(2). Under § 362(g), the party requesting relief has the burden of proof on the issue of equity and the party opposing relief has the burden on all other issues.

■ The Plaintiffs allege that relief from the automatic stay should be granted because there is no equity in the property at issue and the property is not necessary for reorganization. The Plaintiffs have the burden of demonstrating lack of equity, which, for purposes of § 362(d)(2), requires a showing that the value of the collateral is less than the sum total of all of its liens. Further, because this is a Chapter 7 liquidation case, the Court need not reach the second prong of § 362(d)(2), as "there can be no question that the property is not necessary for an effective reorga-

nization." *In re Roxrun Estates, Inc.,* 74 B.R. 997, 1003 (Bankr.S.D.N.Y.1987). *See also Simpson v. SunTrust Mortgage, Inc. (In re Hurst),* 409 B.R. 79, 82 (Bankr. D.Md.2009) (noting that the moving party "need only prove that the debtor lacks equity in the property in order to obtain relief from stay" in a Chapter 7 case); *In re Pelham Enters., Inc.,* 376 B.R. 684, 689 n. 2 (Bankr.N.D.Ill.2007) ("The Court need not determine whether the [p]roperty is necessary to an effective reorganization because [the debtor] filed a Chapter 7 case."); *In re May,* Case No. 4:02–BK–14785 E, 2002 WL 32114562, *3 (Bankr. E.D.Ark. July 18, 2002) ("[I]f a creditor proves that there is no equity in the subject property in a Chapter 7 case, the stay should be lifted because there can be no question that the property is not necessary for an effective reorganization where the debtor only seeks to liquidate her assets.").

The Plaintiffs also allege that cause exists to grant relief pursuant to § 362(d)(1) because their interest in the property is not being adequately protected due to the Trustee's failure to care for and protect it. The Plaintiffs claim that the Trustee has failed make monthly payments on the Line of Credit Note and the Replacement Note, and that she has failed to pay insurance on the Franklin Plant, provide security services, or provide utility services. Motion for Relief, ¶¶ 30–32. Further, the Plaintiffs argue that the Trustee failed to "undertake any serious effort to sell" the property. *Id.* at 33.

■ Pursuant to § 362(g), once the movant demonstrates cause for relief, it is the non-moving party's burden to demonstrate that the property is being adequately protected and, therefore, the circumstances do not warrant the lifting of the automatic stay. While "adequate protection" is not defined by the Bankruptcy

Code,[39] whether a particular secured creditor is adequately protected is a determination to be made on a case-by-case basis and is within the discretion of the Court. *The Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir.1987)). Here, the Trustee admits that she did not make payments on the Line of Credit Note or the Replacement Note, pay for the insurance, provide security services, provide utility services, or undertake efforts to sell the property. *See* Trustee's Amended Response, ¶¶ 29–33. However, the Trustee points out that the Plaintiffs took it upon themselves to have the security and utility services and insurance provided.[40] *See id.* ¶ 34.

In response to the Plaintiff's argument for relief based on § 362(d)(1), the Trustee further states that "[t]he claims of Roger Drake and [the Plaintiffs] in the [Franklin Plant and the Debtor's Personal Property] have not been allowed and should not be allowed." *Id.* The Court will construe the Trustee's overarching argument as an assertion that equity exists in the property, either through recharacterization of the debt to equity (which argument has been disposed of as set forth above) or by applying different valuation techniques to the property at issue. The idea of "[e]quity . . . has significance to the issues raised by section 362(d)(1)." *In re Colonial Center,*

*Inc.,* 156 B.R. 452, 459 (Bankr.E.D.Pa. 1993). For example, "[i]f the value of the collateral is substantially greater than the lien held by the moving secured creditor and all liens with priority over that held by the movant, then this substantial 'equity cushion' can provide adequate protection to the secured [creditor]." *Id.* at 460. Thus, the Court finds that the Trustee's response should be construed as an argument that an equity cushion exists.

With regard to the measurement of equity, this Court agrees with the reasoning in *In re Colonial Center, Inc.,* where the Court found that in certain circumstances, the equity measurements to be performed under subsections (d)(1) and (d)(2) of § 362 are identical. The Court stated:

Unlike equity under section 362(d)(2), which is a function of the value of the collateral and the total of the liens against it, equity under section 362(d)(1) considers the lien position of the movant and the likelihood that its secured interest would be diminished were the stay not lifted. If the movant lienholder bears little risk of nonpayment if the stay were to continue because the value of the collateral is significantly in excess of its lien, and this cushion is not eroding too rapidly, the secured interest of this creditor is adequately protected with the meaning of sections 361 and 362. Obviously, the two equity measurements (but not their purposes) under

**39.** Section 361 of the Bankruptcy Code does, however, discuss "adequate protection" and offers three non-exhaustive examples of how such could be provided. Section 361 states that "adequate protection may be provided by (1) requiring the trustee to make . . . periodic cash payments to [the secured creditor], to the extent that the stay . . . results in a decrease in the value of [the secured creditor's] interest in such property; (2) providing to [the secured creditor] an additional or replacement lien to the extent that such stay . . . results in a decrease in the value of [the

secured creditor's] interest in such property; or (3) granting such other relief . . . as will result in the realization by [the secured creditor] of the indubitable equivalent of [its'] interest in such property." 11 U.S.C. § 361.

**40.** For purposes of this opinion, the Court does not take a position on whether the Trustee exercised her statutory duties in allowing the Plaintiffs to ensure that insurance, utility, and security services were provided for the property.

subsections 362(d)(1) and (d)(2) become identical when the secured creditor seeking relief from the automatic stay holds the only lien or holds the lien with the lowest priority.

*Id.* Because the Plaintiffs hold the only liens on the subject property, this Court finds that the equity measurements for purposes of § 362(d)(1) and § 362(d)(2) are identical. Thus, before determining whether relief should be granted pursuant to subsection (d)(1) or (d)(2), the Court must calculate two figures: the value of the collateral and the amount of the liens encumbering the collateral.

The first step in calculating the equity measurement is to determine the value of the collateral. The Motion for Relief states the Plaintiffs are moving for relief as to the Franklin Plant and the Debtor's Personal Property, which is defined as the "machinery, equipment, and other tangible personal property located at the Franklin Plant." Motion for Relief, ¶¶ 4–5. However, the Trustee argues that the Plaintiffs claim a security interest in collateral in addition to that named in the Motion for Relief, and the value of the additional collateral should be included in determining the value of the collateral. Trustee's Memorandum, p. 3. The Security Agreement defines "collateral" as a "blanket security interest" in all accounts, inventory, furniture, fixtures and equipment, general intangibles, instruments, documents, and chattel paper. Plaintiff's Ex. 12, at ¶ 2; *see also* Plaintiff's Ex. 17, at ¶ 4. Further, the Security Agreement states that "[t]he Collateral will be located at 33551 Carver Road, Franklin, Va.; 1400 Armory Drive, Franklin, Va.; 1009 NC Highway South,

Louisburg, NC 27549; 2956 Highway 17 South, Washington, NC; 3887 South NC 41, Wallace, NC." Plaintiff's Ex. 12, at ¶ 3(k). Based on the Security Agreement, the Plaintiffs are secured by collateral in addition to that which they are moving against in their Motion for Relief (the "Additional Collateral").[41] Therefore, the issue becomes whether the Court must include in its calculation of the value of collateral the value of the Additional Collateral.

In *In re NationsBank of Virginia, N.A. v. DCI Publishing of Alexandria, Inc.,* 160 B.R. 538 (E.D.Va.1993), the District Court reviewed a bankruptcy court's denial of relief from the automatic stay pursuant to § 362(d)(2). The bankruptcy court found the debtor owned property "worth $900,000.00, but that the [creditor's] liens against it totaled $4.7 million. The [b]ankruptcy [c]ourt also found that the [creditor's] security for loans to the debtor included liens totaling $5.2 million on property owned by the debtor's guarantors." *Id.* at 539. On appeal, the District Court considered whether the bankruptcy court erred in considering the "creditor's 'equity cushion' relating to property other than the debtor's." *Id.* at 538. The District Court found that " § 362(d)(2) excludes consideration of any equity cushion the creditor may have based on properties not owned by the debtor." *Id.* at 539. The District Court reasoned that the language " '[s]uch property' in subsection (d)(2) plainly refers to the debtor's property that secures the debt in issue." *Id.* at 540. Thus, since the property owned by the guarantors could not be considered in

---

41. A review of the Debtor's Amended Schedule B indicates that the following items of collateral should also be included in the calculation: accounts receivable from the "Franklin S & S Retail Sales Parts and service labor," and "Louisburg S & S Retail Sales Parts and service labor;" patents, copy-

rights, and other intellectual property; office equipment, furnishing, and supplies; machinery, fixtures, equipment, and supplies used in business located at the Debtor's Louisburg, North Carolina, location; and inventory located at Louisburg.

the equity cushion determination, the District Court found that the debtor had no equity in the relevant property. *Id.*

 The instant case differs from *NationsBank of Virginia* in that the additional collateral to be considered is owned by the debtor. *See also In re Miller*, No. 98–10027DWS, 1998 WL 151427, at *2 (Bankr. E.D.Pa. Mar.23, 1998) (finding that *NationsBank of Virginia* stands for the proposition "that non-debtor collateral will not be considered in an equity analysis under § 362(d)(2)(A)"). As stated in *In re Colonial Center:*

> The measurement of equity in section 362(d) … should depend upon the circumstances and the purpose behind the valuation of property. Obviously, if a debtor's estate consists of inventory encumbered by a lien, a court should consider the entire inventory—and not one or two pieces—in determining whether equity exists for purposes of lifting the bankruptcy stay in favor of a creditor with a security interest in all of the inventory.

*In re Colonial Center, Inc.*, 156 B.R. 452, 461 (Bankr.E.D.Pa.1993). Thus, this Court finds that all the collateral as defined by the Security Agreement should be included in determining the value of the collateral.

Because the Trustee put forth no evidence as to the value of the Additional Collateral, the Court will accept the values listed in the amended schedules.[42] Thus, the Court finds that the Additional Collateral should be valued at $255,540.98. In valuing the Franklin Plant and the Debtor's Personal Property, the Court acknowledges that at the hearing on the Motion for Relief the Plaintiffs testified that the amounts reflected on the amended schedules as the "current market value of debtor's interest in property" are higher than the Plaintiffs believe the collateral is worth. However, as the Court was not offered a method by which to discount the scheduled values, the Court will use the values on the amended schedule for purposes of this Motion for Relief. Thus, the Court finds that the Franklin Plant should be valued at $3,287,800.00 and finds that the Debtor's Personal Property securing the Replacement Note (including the Additional Collateral) should be valued at $1,594,950.00. The total value of the collateral at issue is $5,138,290.98.

The second step in calculating the equity measurement is to determine the amount of the liens on the property. The Plaintiffs argue that, as of the petition date, the Debtor owed, inclusive of pre-petition interest, $1,256,161.10 on the Line of Credit Note and $3,631,857.35 on the Replacement Note. The Trustee argues that both amounts are overstated, and the Court will address each objection in turn.

---

**42.** Among the arguments advanced by the Trustee is that the collateral should be valued at their insured values. However, the Trustee provides no legal support for her theory. It is well-settled that an insurance policy is a contract, the proceeds of which represent a contractual benefit payable upon loss in return for premiums earlier paid. "Th[e insurance] money is a recovery of or a realization on that contract right. The money is not a substitute for the goods." *In re Hoffpauir*, 258 B.R. 447, 455 (Bankr.D.Id.2001). *See also In re Simpson*, 238 B.R. 776, 779 (Bankr.S.D.Ill. 1999) (quoting *Monniea v. German Ins. Co.*, 12 Ill.App. 240, 244 (1883)) ("A debtor's right to insurance proceeds for damage to property derives, not from the property itself, but from a contract of indemnity between the debtor and the insurance company.... [I]nsurance proceeds for destruction of [the property at issue] are paid, 'not as the price or equivalent of the property insured,' but under an agreement to indemnify the debtor against its loss."). Therefore, the Court finds that it is inappropriate to equate the insured values with the actual value of the property at issue in the instant matter.

■ As to the Line of Credit Note, the Trustee argues that Roger Drake failed to establish the amount of his claim under the Line of Credit Note, asserting that the Debtor's corporate resolutions show authority was granted for only a $550,000.00 loan to be made to the Debtor. Further, she argues that there is no evidence that the Board approved anything above that amount as a loan to the Debtor, and Roger W. Drake has not provided any proof of the same. Thus, to the extent that Roger Drake's claim is allowed, the Trustee seems to argue that it should be limited to the principal amount of $550,000.00, which was approved by the Board of Directors.

Generally, pursuant to Virginia law, "corporate action may not be challenged on the ground that the corporation lacks or lacked power to act." Va.Code Ann. § 13.1–629(A). However, subsection (B)(2) of Virginia Code § 13.1–629 states that "[a] corporation's power to act may be challenged ... through a receiver, trustee, or other legal representative, against an incumbent or former director, officer, employee, or agent of the corporation...." Assuming the circumstances of the instant case fit within the threshold parameters enunciated in subsection (B)(2), the Court finds that the argument must fail.

In *In re Kilgore Meadowbrook Country Club, Inc.,* 315 B.R. 412 (Bankr.E.D.Tex. 2004), the Chapter 11 debtor's former president and general manager, Victoria Eggers, filed a proof of claim based upon a series of loans she made to the debtor. The debtor objected to the proof of claim, arguing that the cash infusions were gifts, not loans, and the proof of claim should be disallowed. Based on the evidence presented, the Court found that the transfers of money from Ms. Eggers were properly characterized as loans and overruled the debtor's objection. *Id.* at 418–20. The Court then addressed the argument that the loans were made *ultra vires,* stating:

While there is no dispute that no corporate resolution authorizing the borrowing of sums from Ms. Eggers was ever passed by the Debtor's Board, there is also no dispute that the Debtor's Board happily accepted ... the sums lent to the corporation by Ms. Eggers which were undisputedly utilized in the ongoing operations of its business.... Under such circumstances, Texas courts have historically recognized that a corporation will be deemed to have ratified the transaction and cannot thereby deny liability for such indebtedness because of a lack of formal approval by the board of directors.

*Id.* at 424 (citations omitted).

■ This Court is persuaded by the similarities between the facts of the case at hand and the facts of *In re Kilgore Meadowbrook Country Club* and finds that Virginia courts would rule consistent with the Texas court. First, Virginia courts generally find that a corporation that has received and retained the benefits growing out of an *ultra vires* contract cannot later interpose the defense of *ultra vires* to avoid liability under the contract. *See French v. Long,* 42 F.2d 45, 47 (4th Cir. 1930) (holding that where the corporation enjoyed benefits derived from the notes, the corporation cannot avoid liability on the ground of *ultra vires* ); *Holstein–Harvey–Kirk Co. v. H. Kirk & Sons,* 150 Va. 82, 93, 142 S.E. 373 (1928) ("A corporation ought to act through its board of directors, and in accordance with its charter limitations, but if it declines to do so, it cannot be permitted to accept the benefits of irregular contracts without assuming all of its consequential liabilities thereunder."). Here, evidence was presented by the Plaintiffs that the funds advanced under both the Line of Credit Note and the Replacement Note were used for working capital.

In addition to receiving a benefit under the transaction, ratification exists in this case as well. "Ratification is the adoption of a contract, in some manner irregularly made, which relates back to the execution of the contract and renders it obligatory from its inception." *Brewer v. The First Nat'l Bank of Danville,* 202 Va. 807, 814, 120 S.E.2d 273 (1961) (citations omitted). Making payments on an agreement is strong evidence of a corporation's obligation, and in certain circumstances, "constitutes a ratification of the agreement by the corporation." *Id.* ("But the strongest evidence of all, pointing to corporate obligation, lies in the fact that the corporation made the payments, called for in the agreement, to [the creditor] for a period of four years, three and one-half months."). Further, "ratification of the act by the long acquiescence therein by the corporation precludes any objection of a lack of power in the corporation to perform the act in the first instance." *Id.*

Here, Roger Drake testified that, under the Line of Credit Note, he advanced $550,000.00 in August 2001, $200,000.00 in December 2002, and $250,000.00 in 2003. Roger Drake further testified that under the terms of the Line of Credit Note, interest payments were required, and those payments were made by the Debtor from the proceeds of the Debtor's operations until the summer of 2005. Thus, the Debtor paid interest payments on principal amounts over the $550,000.00 amount approved by the board for at least two years.

Accordingly, the Court finds that the principal balance allowed under the Line of Credit Note should not be limited to the $550,000.00 approved by the Board of Directors. Rather, the Court accepts the figure presented by the Plaintiff of $1,256,161.10 as an accurate calculation of the principal balance and interest due thereon as of the petition date.

As to the Replacement Note, the Trustee argues that the outstanding principal balance should be no greater than $2,316,542.48. Her argument stems from documents received from the Debtor's accounts, Goodman & Company, that reflect the outstanding principal balance, exclusive of interest, as of June 26, 2006, was no greater than $2,316,542.48, and deposition testimony of Randy Drake, who stated that no further advances were made after that time. Thus, the Trustee appears to be arguing that the principal balance should be limited to $2,316,542.48, rather than the $3,072,972.48 principal amount advocated by the Plaintiffs.

According to the testimony of Wilson and Randy Drake at the final hearing, however, an additional amount of $756,000.00 was advanced in July 2006. As discussed *supra,* this advance consisted of applying previously unsecured loans made to the Debtor against the credit line, thereby securing those sums. Further, the interest log exhibit submitted by the Plaintiffs shows that an advance of $756,430.00, was included in the July 31, 2006, entry. The note related to the entry states, "Transferred from RWD, RWD, JR, & R B Drake Unsecured Notes." The July 31, 2008, entry log displays an end balance of $3,072,972.48. *See* Plaintiff's Ex. 25, Interest Accrual Schedule for Replacement Note with attached related documents. The Court finds that nothing barred the Plaintiffs' actions related to the $756,430.00 advance. The Court further finds the testimony of Wilson and Randy Drake and the contents of the exhibit credible. Therefore, the Court accepts the figure presented by the Plaintiffs of $3,631,857.35 as an accurate calculation of the principal balance and interest due thereon as of the petition date.

The Court therefore finds that the total combined amount owed under the Line of Credit Note and the Replacement Note as

528

of the petition date was $4,888,018.45. As the value of the collateral has been established as $5,138,290.98, this seemingly creates equity of $250,272.53, and an equity cushion of 4.87%.

■ A "substantial 'equity cushion' can provide adequate protection." *See In re Colonial Center, Inc.*, 156 B.R. 452, 460 (Bankr.E.D.Pa.1993). Judge Clarke has explained:

> Under the "equity cushion" theory, if a debtor has equity in a property sufficient to shield the creditor from either the declining value of the collateral or an increase in the claim from accrual of interest or expenses, then the creditor is adequately protected. *See In re Kost*, 102 B.R. 829, 831 (D.Wyo.1989); *In re Lane*, 108 B.R. 6, 7 (Bankr.D.Mass. 1989). The amount of equity cushion sufficient to adequately protect the creditor is determined on a case-by-case basis. *Kost*, 102 B.R. at 831. However, the reported cases do provide some guidance:
>
>> Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection.... Case law has almost as uniformly held that an equity cushion under 11% is insufficient to constitute adequate protection.... Case law is divided on whether a cushion of 12% to 20% constitutes adequate protection....
>
> *Id.* at 831–832 (citations omitted) (quoting *In re McKillips*, 81 B.R. 454, 458 (Bankr.N.D.Ill.1987)).

*Equitable Life Assurance Soc'y of the United States v. James River Assocs. (In re James River Assocs.)*, 148 B.R. 790, 796 (E.D.Va.1992). *See also Suntrust Bank v. Den–Mark Constr., Inc. (In re Den–Mark Constr., Inc.)*, 406 B.R. 683, 700–01 (E.D.N.C.2009) (bankruptcy court erred when it "found that an 11 % equity cushion is adequate protection when combined with (1) improvements to SunTrust's collateral resulting in an increase in value thereof, (2) a reduction in SunTrust's debt (thus an equity cushion increase) resulting from the elimination of the letters of credit and (3) a $12,000.00 monthly interest payment"); *Bank Rhode Island v. Pawtuxet Valley Prescription & Surgical Ctr.*, 386 B.R. 1, 5 (D.R.I.2008) ("Although it has been held that an equity cushion, standing alone, can provide adequate protection, ... it seems that a 4% cushion typically is not taken to constitute adequate protection."); *Kost v. First Interstate Bank of Greybull (In re Kost)*, 102 B.R. 829, 831–32 (D.Wyo.1989) (reviewing cases and finding that courts generally find an equity cushion of 20% or more to be adequate while a cushion of less than 11% is inadequate); *Principal Mut. Life Ins. Co. v. Atrium Dev. Co. (In re Atrium Dev. Co.)*, 159 B.R. 464, 471 (Bankr.E.D.Va.1993) ("In this case there is an equity cushion over Principal's deed of trust balance of approximately 12% based on the court's findings in its ruling on Principal's motion for relief from stay. In my view, the 12% equity cushion falls far short of establishing that Principal is demonstrably oversecured. Case law has almost uniformly held that an equity cushion under 11 % is insufficient to constitute adequate protection, and case law is at best divided on whether an equity cushion of 12% to 20% constitutes adequate protection."); *In re Fortune Smooth (U.S.) Ltd.*, Case No. 93 B 40907, 1993 WL 261478, at *6 (Bankr.S.D.N.Y. July 6, 1993) ("Here, the equity cushion presently stands at 14.89% and is certain to decline in the immediate future. Given the declining equity cushion and the uncertain nature of New York commercial real estate market, we find that the equity cushion in this case does not constitute adequate protection."); *Bargas v. Rice (In re Rice)*, 82 B.R. 623, 627 (Bankr.D.Ga.1987) ("Here, the equity cushion is relatively small ($36,000) which in percentage terms is less than 5%. In view of the likely costs of sale and the

inherent delay which will occur in marketing this unique piece of realty I cannot reasonably conclude that the equity cushion in this realty, standing alone, will adequately protect Movant as contemplated by 11 U.S.C. Section 361."); *Perin v. N–Ren Corp. (In re N–Ren Corp.),* 65 B.R. 661, 663 (Bankr.S.D.Ohio 1986) ("[W]e must observe that appraisal is not an exact science, and any appraisal figure which may be offered is subject to a substantial tolerance. In this case, the purported equity cushion which would exist if we accepted Case's appraisal is less than 5% of debtor's indebtedness to movant. We consider this to be within the range of error and cannot conclude that an equity cushion exists."); *In re Kertennis,* 40 B.R. 895, 899 (Bankr.D.R.I.1984) ("There are several factors in the instant proceeding which indicate that the minimal equity cushion (less than 4% of the market value of the property) fails to provide adequate protection to the SBA's interest.").

■■■■ "Whether an equity cushion provides adequate protection to a creditor is determined on a case-by-case basis rather than by mechanical application of a formula." *In re Kost,* 102 B.R. at 831. However, an equity cushion of 4.87% is not substantial and cannot be found to constitute adequate protection. Further, taking into account accrued post-petition interest, cost of sale, accruing attorney's fees and collection costs and the Plaintiff's testimony that the property was overvalued as scheduled and continues to depreciate, the Court finds it infeasible that any equity would be left for the bankruptcy estate.

Pursuant to § 362(g), the Trustee must carry the burden of demonstrating the property is adequately protected and that cause does not exist to lift the automatic stay. The Court finds that the Trustee has not carried her burden in the instant

matter. An insufficient equity cushion exists based upon the evidence presented to the Court and a lack of evidence presented by the Trustee to show that adequate protection exists. Therefore, the Court finds that relief pursuant to § 362(d)(1) should be granted. Because Sections 362(d)(1) and 362(d)(2) are read in the disjunctive, the Court will not address whether relief should be granted pursuant to § 362(d)(2). In addition, the Court finds no merit in the Trustee's argument that the possibility that additional causes of action may exist should forestall decision in the instant matter.

## V. ABANDONMENT

■■■■ The Plaintiffs additionally ask the Court to enter an order requiring the Trustee to abandon her interest in the Franklin Plant and the machinery, equipment, and other tangible personal property located at the Franklin Plant. The Trustee opposes the request for relief, stating:

> Section 554 allows a trustee, after notice and a hearing, to abandon property that is either: (1) of inconsequential value, or (2) burdensome to the estate. Generally, unless the trustee agrees to abandonment of a particular property of the estate, no order of abandonment should be issued at the request of a party-in-interest. *In re Janmar, Inc.,* 4 B.R. 4, 8 (Bankr.N.D.Ga.1979) (holding that abandonment could not be ordered absent trustee agreeing to it).

Trustee's Memorandum, p. 8. The Court believes the Trustee gives too narrow a reading to both § 554 and *Goger v. United States (In re Janmar, Inc.),* 4 B.R. 4 (Bankr.N.D.Ga.1979). First, while § 554(a) allows the trustee to abandon property on her own volition, § 554(b) allows a court, on request of a party in interest, to order a trustee to abandon property.[43] Second, *In re Janmar* did not

---

**43.** Section 554 states:

(a) After notice and a hearing, the trustee

hold that abandonment could not be ordered absent a trustee agreeing to it. *In re Janmar* denied the defendant's request for abandonment and found that "[g]enerally, unless the trustee agrees to abandonment . . . no order for such abandonment shall be issued at the request of a party in interest." *In re Janmar*, 4 B.R. at 10. Webster's Dictionary defines generally to mean "in disregard of specific instances and with regard to an overall picture." Thus, *In re Janmar* stands for the proposition that while the Trustee's consent is *generally* required, whether such consent is actually required depends on the specific facts and circumstances of the case at hand.

Further, before reaching its conclusion, the court in *In re Janmar* distinguished the facts of the case it had at hand from the facts of a case that may not require a trustee's consent. The court stated, "[t]he defendant here is not claiming that his equity in the property is so great that any equity remaining in the trustee is inconsequential," and, "[c]ases describing a 'duty to abandon' have invariably been decided in situations in which the evidence clearly showed that the lien exceeded the value of the collateral and administration of the asset would cause expense to the estate." *Id.* at 9, 10.

■■■ This Court believes the facts and circumstances of this case warrant abandonment of the Franklin Plant and the machinery, equipment, and other tangible personal property located at the Franklin Plant without the Trustee's consent. The

collateral is of no benefit to the estate because, as the Court ruled *supra*, the Plaintiffs' claims secured by these assets are properly characterized as debt and not equity. In addition, this is a Chapter 7 liquidation case, so the Debtor *ipso facto* does not need the property for reorganization purposes. Further, the collateral is of no value to the estate because, as the Court stated *supra*, it is infeasible that any equity would be left for the estate. Thus, further administration of the collateral would cause expense to the estate and would only serve to increase the Trustee's fees.[44] Accordingly, pursuant to § 554(b), the Court finds that the Franklin Plant and the machinery, equipment, and other tangible personal property located at the Franklin Plant should be abandoned.

## VI. SUMMARY

For the reasons set forth above, the Court finds that the Trustee's defense that the Line of Credit Note and the Replacement Note should be recharacterized from debt to equity should be denied. The Court further finds that the Motion for Relief should be granted under 11 U.S.C. § 362(d)(1). Finally, the Court finds that the Franklin Plant and the machinery, equipment, and other tangible personal property located at the Franklin Plant should be abandoned pursuant to 11 U.S.C. § 554(b).

A separate order will issue.

The Clerk is ORDERED to forward a copy of this Memorandum Opinion to Ross

---

may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

(b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

11 U.S.C. § 544(a)-(b).

**44.** *See Morgan v. K.C. Mach. & Tool Co. (In re K.C. Mach. & Tool Co.)*, 816 F.2d 238, 246 (6th Cir.1987) (explaining that § 554(b) was enacted, at least in part, to curb a trustee's "practice of selling burdensome or valueless property simply to obtain a fund for their own administrative expenses").

C. Reeves, counsel for Roger Drake, Randy Drake, and Wilson Drake; Harry W. Jernigan, III, counsel for the Chapter 7 Trustee; Carolyn L. Camardo, Chapter 7 Trustee; Douglas M. Foley, counsel for the Debtor; and to Debera F. Conlon, Assistant United States Trustee.